No. 26,556.

GODFREY BERG et al., *Appellants*, v. FREDERICK SCULLY, *Appellee.*

SYLLABUS BY THE COURT.

1. LANDLORD AND TENANT — *Lease — Construction — Admissibility of Evidence.* The defendant, and his father before him (William Scully), owned and controlled vast tracts of farming land in Marion and other counties. They adopted and for a long period of years have followed a practice of requiring tenants to erect all improvements on their farms, and have required incoming tenants to purchase such improvements from the awaygoing tenants. The plaintiff became a tenant of the defendant in 1920. Written leases were successively executed between the parties from year to year, the last lease ending the 1st day of February, 1924. Defendant declined to renew plaintiff's lease, and ejected plaintiff from the land without procuring a new tenant to whom plaintiff could sell some $3,000 worth of improvements which he had purchased when he became a tenant in 1920. In an action by plaintiff to recover from defendant the value of such improvements, an offer by plaintiff to prove defendant's practice of so dealing with his tenants was refused. *Held,* error.

2. EVIDENCE—*Parol Evidence Affecting Writing—Ambiguity in Contract.* Parties to a contract know best what was meant by its terms, and are the least liable to be mistaken as to its intention, and, where the contract is silent or ambiguous concerning a vital point incident thereto, parol evidence will be received to aid in its construction.

3. LANDLORD AND TENANT—*Lease—Construction—Intent of Parties—Evidence.* To ascertain the intent of the parties is the fundamental rule in the construction of agreements, and in such construction courts look to the language employed, the subject matter and the surrounding circumstances.

4. SAME—*Lease—Construction—Intent of Parties—Evidence.* The construction given a contract by both parties through a long term of years is persuasive in arriving at their intention and purpose.

5. SAME—*Lease—Equitable Construction.* A practical and equitable construction of the ambiguous terms of a contract should be adopted.

Appeal from Marion district court; CASSIUS M. CLARK, judge. Opinion filed April 10, 1926. Reversed.

*Frank L. Martin* and *James N. Farley,* both of Hutchinson, for the appellants.
*R. L. King* and *Roscoe King,* both of Marion, for the appellee.

The opinion of the court was delivered by

HOPKINS, J.: The plaintiff, a tenant, sought to recover the value of improvements owned by him on land of the defendant, his land-

---

Contracts, 13 C. J. pp. 521 n. 18, 541 n. 23, 546 n. 54. Evidence, 22 C. J. p. 1175 n. 44; 25 A. L. R. 787; 16 R. C. L. 698. Landlord and Tenant, 35 C. J. pp. 1175 n. 91, 1180 n. 80, 1189 n. 50; 36 C. J. pp. 181 n. 41, 192 n. 41. Trial, 38 Cyc. p. 1543 n. 68.

lord. A demurrer to plaintiff's evidence was sustained and he appeals.

The defendant and his father (William Scully) before him have owned and controlled large tracts of land in Marion and other counties for perhaps more than a half century. (*Scully v. Dodge,* 40 Kan. 395, 19 Pac. 807.) They have rented the lands to tenants under a lease which provides for improvement of the land by the tenant. The land here involved had been farmed by plaintiff's father who, while a tenant, erected the improvements thereon. Plaintiff became a tenant of the defendant and purchased the improvements in 1920. Written leases were successively executed between the parties from year to year, the last one ending the last day of February, 1924. It provided, among other things, that the tenant should sow at least forty acres in small grain such as wheat, oats, rye, etc. Failure so to do rendered him liable to forfeiture of $1 per acre as liquidated damages in addition to the rent reserved. The lease required plaintiff to maintain at least ten acres in alfalfa, and in case of failure to pay $3 per acre in addition to the rent reserved. A provision with respect to improvements on the land reads:

"That the said landlord is not liable to make or erect any houses, fences, or other improvements whatsoever on or about said lands; nor to be liable to contribute in any way to the making, erecting or repairing any such houses, fences or other improvements; nor to allow for the same; nor to be responsible for any damage that may arise or be done through any want of or deficiency in the same; the said tenant taking said premises as they are, and agreeing to make all such improvements as he may deem necessary for the efficient cultivation of said land and for the protection of the crops at his own exclusive cost and expense. But the said landlord hereby agrees, that upon the expiration of the term of this lease, and upon the rent and taxes herein provided for being fully paid, and the other promises and undertakings herein written having been done, kept and performed by the said tenant (but not otherwise), that he, the said landlord, will consent to the removal of all buildings, fences or other chattels made or erected by the said. tenant upon said premises, or belonging to him thereon, provided that said removal be made promptly; but all buildings, fences or other improvements thereon belonging to the landlord, and all additions or repairs that may be made or done to the same during this lease; and any hedges or live fence, fruit or the trees that may be planted, set out or grown on said premises at any time previous to or during the term of this lease, shall be deemed fixtures and shall not be removable under any circumstances or at any time."

On July 16, 1923, the defendant served plaintiff with written notice that his lease would not be renewed; that he must vacate by March 1, 1924; that he must dispose of his improvements on the

Berg v. Scully.

leased premises after his rents had been paid; that he should not put in fall crops. Plaintiff was unable to dispose of his improvements at the expiration of his tenancy because the defendant procured no new tenant for the premises. He was evicted and brought this action to recover the value of his improvements.

Plaintiff alleged in his petition that he purchased the improvements in 1920, consisting of "a four-room house, barn and shed for six horses, granary, hen house, tool house, windmill, fence around the pasture and one-half mile of partition fence, one and one-half mile of fence in all. That said improvements connected with and are a part of the real estate. . . . That defendant consented and authorized the plaintiff to purchase the said improvements as a part of the land and rented the plaintiff the land, which could not be used as a farm without the improvements. . . . That at the time he executed the said lease, he owned the said improvements, which, connected with and as a part of the land, are of the reasonable cash value of $2,950."

The plaintiff contends that the court erred in excluding evidence of defendant's practice in dealing with his tenants. Plaintiff alleged and sought to prove that defendant's course of dealing over a period of many years had been to require an incoming tenant to negotiate for and purchase the improvements of the away-going tenant; that this method of dealing was the invariable rule when plaintiff purchased the improvements and leased defendant's land in 1920; that defendant's agent at the time told plaintiff he could not rent the land unless he bought and owned the improvements; that the defendant would not own and would not maintain improvements for his tenants; that the defendant's tenants had never been required to move their improvements and buildings from the land. The plaintiff sought also to prove that he could not sell or dispose of his improvements without the assistance of defendant or his agent; that he could neither find a buyer nor sell the improvements without the consent of the defendant or his agent; that no assistance was rendered him by the defendant; that the defendant failed to lease the land to any other tenant, and refused to permit plaintiff to continue thereon, and evicted him therefrom; that by so doing, the defendant appropriated plaintiff's improvements valued at from $3,000 to $4,000; that the improvements owned by the plaintiff added a value of $25 per acre to the farm. He (plaintiff) testified that there was a crop of wheat growing on the place when he first purchased the improvements; that during the time he occupied the land he had

planted .wheat every fall; that while the improvements were worth $3,000 to $4,000, yet if torn down and removed they would not bring a sufficient amount to pay the expense of their removal; that there was no place to which he could remove them; that the defendant owned vast tracts of land in that neighborhood, and all his tenants were required to provide and furnish their own improvements; that there was no market for, nor place where plaintiff could sell such improvements; that the land in question was seven and a half miles from the nearest railroad station; that all of plaintiff's savings were invested in the improvements and were so invested at the time of the execution of the last lease.

We are of the opinion that the court should have received the evidence of defendant's regular method of dealing with his incoming and away-going tenants. If plaintiff's allegations and offers of proof are true (and for the purpose of the demurrer they must be so regarded), the defendant, his father, and their tenants, through a course of dealing for a long period of years, had given to this particular form of lease an operative interpretation which became a part of it to the same extent as though written therein.

In *Manufacturing Co. v. Merriam*, 104 Kan. 646, 180. Pac. 224, the requisites of a custom were stated.

"Persons are presumed to contract with reference to a custom or usage which pertains to the subject of the contract. (*Smythe v. Parsons,* 37 Kan. 79, 14 Pac. 444.) To constitute a custom which tacitly attends the obligation of a contract, the habit, mode, or course of dealing in the particular trade, business, or locality, must be definite and certain; must be well settled and established; must be uniformly and universally prevalent and observed; must be of general notoriety; and must have been acquiesced in without contention or dispute so long and so continuously that contracting parties either had it in mind or ought to have had it in mind, and consequently contracted, or presumptively contracted, with reference to it." (p. 649.)

The defendant contends that he is not liable for plaintiff's improvements because there was no stipulation in the contract binding him to pay for them; that the plaintiff had the privilege of removing the improvements at the expiration of his lease, and not having done so, he is presumed to have abandoned them, and that such abandonment works a forfeiture (citing in support thereof 36 C. J. 180; also, *Hughes v. Kershaw*, 42 Colo. 210; *Fitzgerald v. Anderson*, 81 Wis. 341; *Free v. Stewart*, 39 Neb. 220; *Smith v. Park*, 31 Minn. 70; *Land & Gravel Co. v. Commission Co.*, 138 Mo. 439; *Shelton v. Jones*, 167 Pac. 458 [Okla.]).

Berg v. Scully.

On the other hand, the plaintiff argues that the defendant's authorities are not in point; that plaintiff does not seek to change the terms of the contract; that the lease says nothing whatever about the fact that plaintiff, upon entering into the first lease, was required to conform to the usual custom and course of dealing adopted by Scully to purchase the away-going tenant's buildings and improvements; that the contract fails to recite that Scully required each new tenant, including plaintiff, to purchase the buildings, fences and crops of the away-going tenant; that while the lease contains a clause to the effect that, under certain conditions, the landlord will give his consent to the removal of the improvements, it is silent upon the question of what will become of the improvements if plaintiff does not have consent to remove them or cannot do so.

The primary rule in construction of contracts is to ascertain the intent of the parties, and that intent may best be ascertained by taking into consideration all the circumstances and conditions which confronted the parties when they made the contract.

"As said in the opinion in *Talbott v. Richmond & Danville R. R. Co.,* 3 Va. Law J. 486, to ascertain the intent of the parties is the fundamental rule in the construction of agreements (*Canal Co. v. Hill,* 15 Wall. 94 [21 L. Ed. 64]); and in such construction courts look to the language employed, the subject matter, and the surrounding circumstances. They are never shut out from the same light which the parties enjoyed when the contract was executed, and in that view they are entitled to place themselves in the same situation which the parties who made the contract occupied, so as to view the circumstances as they viewed them, and so to judge of the meaning of words and of the correct application of the language to the things described." (*Chesapeake & Potomac Tel. Co. v. Withe Mut. Tel. Co.,* 129 S. E. 389, 392 [Va.].)

"Construction given a contract by both parties through a long term of years is persuasive in arriving at the intention and purpose of contracting parties." (*Wabash Ry. Co. v. American Refrigerator Transit Co.,* 7 Fed. [2d] 335.)

"It is to be assumed that parties to a contract know best what was meant by its terms, and are the least liable to be mistaken as to its intention; that each party is alert to protect his own interests and to insist on his rights, and that whatever is done by the parties during the period of the performance of the contract is done under its terms as they understood and intended it should be. Parties are far less liable to have been mistaken as to the meaning of their contract during the period while harmonious and practical construction reflects that intention, than they are when subsequent differences have impelled them to resort to law. One of them then seeks a construction at variance with the practical construction they have placed upon it of what was intended by its provisions. It has even been said that the practical construction of the ambiguous terms of a contract will be adopted, although the lan-

guage used may more strongly suggest another construction. According to some decisions, the practical construction placed upon the contract by the parties themselves may render it immaterial to consider what might be the literal construction of its terms. This conclusion is based upon the view that parties to a contract have a right to place such an interpretation upon its terms as they see fit, even when such an interpretation is apparently contrary to the ordinary meaning of its provisions." (6 R. C. L. 853.)

In the instant case the parties, when executing the lease in question, had in view all the conditions that necessarily obtained in extensive tenant farming in Marion county. They considered the methods adopted and followed by the defendant in his dealings with his tenants during a long period of years whereby they had constructed lasting improvements on his land. These, together with other matters alleged by the plaintiff hereinbefore mentioned, were doubtless considered by the parties in the execution of the lease, and all are proper matters for consideration now in ascertaining the intent of the parties when their relations of landlord and tenant were entered into.

In a discussion of evidence tending to prove custom, Dean Wigmore, among other things, says:

"There is no reason, in the nature of things, why the individual parties to a transaction may not employ words in a particular sense, irrespective of the ordinary or popular sense; because what we are seeking, in interpretation, is their actual standard, and the popular standard is merely taken provisionally as presumably theirs. It can thus be, in theory, only a question of fact in each case whether the parties were using a special mutual sense. But in practice two rules intervene to obstruct the simple application of this principle. One is the rule against varying the terms of a contract by setting up other terms in competition with it. . . . This rule makes it often difficult to accept the parties' understanding as a source of interpreting the written words without virtually substituting extrinsic terms. The other is the supposed rule against disturbing a 'plain meaning' by any other meaning, or, as sometimes phrased, against using extrinsic evidence unless the terms are ambiguous. . . . But the universal application of the principle to contracts and other documents has also gradually been perceived. There is no transaction whatever in which, for some idea or other, the parties do not use words in a sense of their own. Having themselves locked up the idea in the words, themselves must furnish the key to unlock it. The antiquated notion that a document must be construed solely within its four corners, no matter how puzzling the problem, served for a time to retard the full appreciation of sound doctrine." . . . (5 Wigmore on Evidence, § 2465, pp. 392, 394.)

The allegations of plaintiff's petition and the evidence offered in support thereof indicate an arbitrary attempt to deal with the plain-

Berg v. Scully.

tiff in a vastly different manner from defendant's usual policy with his tenants. A growing crop on the land, with the other improvements, would be an added inducement to a prospective tenant who might contemplate leasing the land, and consequently an aid to the away-going tenant in disposing of his improvements. The conduct and acts of the defendant in the instant case indicate that he not only did nothing to aid the plaintiff in his efforts to dispose of his improvements, but that he did those things which tended to prevent such a result. His notice to the plaintiff not to plant a fall crop of wheat leaves a fair inference that he intended to prevent plaintiff from disposing of his property at a fair and reasonable price. His requirement that plaintiff remove his buildings and improvements off the land or forfeit them was unreasonable. He knew they could not be removed without rendering them valueless. His attitude leaves a fair inference that he did not intend, as was his usual course and custom of dealing, to coöperate with the plaintiff in the disposal of his crops and improvements to an incoming tenant. This situation rendered it impossible for the plaintiff to dispose of his improvements. Defendant produced no new tenant. Fair dealing required defendant, under the circumstances, to use every reasonable effort to procure a new tenant who would at least offer a fair price for plaintiff's property. Owing to the peculiar nature of the lease contract it could not be successfully carried out without the coöperation of the landlord in finding a new tenant who could and would pay a fair price for the improvements at the end of plaintiff's term. Defendant's duty to so coöperate was within the fair interpretation of the contract—certainly as against a demurrer to the petition or demurrer to the evidence. The lease contemplates the erection on defendant's lands by his tenants of permanent and lasting improvements, consisting not only of houses, barns and fences, but also the planting of trees and orchards. It could not have been within their contemplation that such should be destroyed at the end of the term, nor that the tenant should forfeit or lose improvements which could not, in reason, be removed. Under all the circumstances a mutual duty existed between the parties to find a new tenant who could take over the lease without sacrificing plaintiff's interest or destroying his property.

No provision of the contract contemplates forfeiture of the tenant's improvements to the landlord. Yet that result obtains through

defendant's action in the instant case. Here no good reason is assigned why the plaintiff should lose his property rights, nor why the property itself should be destroyed. To tear down and destroy the buildings would certainly result in no benefit to defendant. According to the evidence, such an act would have lessened the value of his land $25 per acre. If plaintiff's property had been destroyed a new tenant would have been compelled to erect new improvements. The land is of no value to its owner except through production, and production is not possible except by tillage, which ordinarily requires the present or like improvements. The original purchase of the buildings by the plaintiff was a condition precedent to the contract between the parties. In effect it was part of the consideration of making the lease. Through a mutual understanding between them, Berg became the owner of $3,000 or $4,000 worth of buildings and improvements on defendant's land. Through Scully's general course of dealing, the plaintiff understood and believed he would be able to dispose of his improvements at the end of his tenancy, otherwise he could not have afforded to purchase them and become the defendant's tenant. It may be observed that the custom obtaining between landlords and their tenants in situations like that under consideration has, since the beginning of this action, crystallized into a statute providing, among other things, that under certain conditions leases shall "contain just and fair provisions for the free sale and transfer of such buildings and improvements, or the purchase thereof by the landlord, without requiring the tenant to remove the same from the land." (Laws of 1925, ch. 208, § 1.)

While the statute is not retroactive, and does not apply to the instant case, it is indicative of public policy on this subject, and virtually places defendant's attitude toward this tenant under public condemnation.

The judgment is reversed, and the cause remanded with instructions to overrule the demurrer.

BURCH and MASON, JJ., dissenting.