No. 44,467

Stoddard M. Stevens and Morgan Guaranty Trust Co., a Corporation, Executors and Trustees of the Will of Lucy S. Rutherford, Deceased, *Appellees*, v. Farmers Elevator Mutual Insurance Co., a Corporation, *Appellant*.

(415 P. 2d 236)

Opinion filed June 11, 1966.

*Clarence N. Holeman*, of Wichita, argued the cause, and *Harold Irwin*, *S. J. Glaves* and *Richard R. Eads*, all of Wichita, were with him on the brief for the appellant.

*Terry L. Bullock*, of Topeka, argued the cause, and *Robert L. Webb*, *Ralph W. Oman*, *Philip E. Buzick*, *William B. McElhenny*, *James D. Waugh*, *James L. Grimes*, *Jr.*, *Donald J. Horttor* and *Stewart L. Entz*, all of Topeka, were with him on the brief for the appellees.

The opinion of the court was delivered by

Fontron, J.: This is an action to recover on a Warehouseman's Bond executed pursuant to the provisions of the United States Warehouse Act, 7 U. S. C. A. § 241, *et seq.* (herein referred to as the Act). The plaintiff prevailed in the court below and the defendant has appealed.

The facts are not in dispute. On June 10, 1961, the defendant, Farmers Elevator Mutual Insurance Company, executed a bond as surety for Lyman Grain Incorporated of Belpre, Kansas (hereafter

called Lyman). The bond covered a period of one year from and after June 26, 1961, and was conditioned as follows:

"WHEREAS, the said United States warehouse Act provides that each warehouseman applying for a license to conduct a warehouse in accordance with the terms thereof shall, as a condition to the granting of the license, execute and file with the Secretary of Agriculture a good and sufficient bond to the United States, to secure the faithful performance of its obligations as a warehouseman under the terms of the said United States warehouse Act and the regulations prescribed thereunder and of such additional obligations as a warehouseman as may be assumed by it under contracts with the respective depositors of the above-specified product(s) in such licensed warehouse(s):

"Now, THEREFORE, if the said license(s) or any amendment(s) thereto be granted and said principal shall faithfully perform all of its obligations as a licensed warehouseman relating to transactions entered into during the period of one year commencing June 26, 1961, under the terms of the said United States Warehouse Act and the regulations prescribed thereunder, and such additional obligations as a warehouseman as may be assumed by it during the period aforesaid under contracts with the respective depositors of the hereinbefore-named product(s) in such licensed warehouse(s), then this obligation shall be null and void and of no effect, otherwise to be and remain in full force and virtue."

The conditions of the bond are couched in the language of that section of the Act (7 U. S. C. A. § 247) which requires the giving of a bond and, except as hereafter noted, the phraseology used parallels that of the statute.

On May 23, 1962, the United States Department of Agriculture suspended Lyman's license as a bonded warehouseman and on May 31, 1962, Lyman, at the department's request, surrendered its federal warehouse receipts. The suspension remained in force until Lyman's license expired on June 25, 1962.

On various dates between June 13 to June 18, 1962, the plaintiffs delivered to Lyman at its Belpre elevator, for open storage, 841 bushels of wheat, worth $1,687.89, and received therefor, not warehouse receipts, but weight tickets entitled "United States Warehouse Act-Grain Inspection and Weight Certificates." These weight tickets contained the following:

"I hereby certify that I hold a license under the United States Warehouse Act, and the regulations for grain warehouses thereunder, to inspect, grade and weigh the kind of grain covered by this certificate; that on the above date and at the above place I inspected, graded and weighed the following lot or parcel of grain stored or to be stored in the

"LYMAN ELEVATOR (IN) BELPRE, KANSAS, a warehouse licensed under said Act and regulations; and that the grade of said grain according to the official grain standards of the United States, and the net weight thereof, including dockage, if any, were as stated hereon."

The trial court found that the plaintiffs, at the times they deposited their grain with Lyman, were not aware of the suspension of Lyman's license nor of Lyman's surrender of its warehouse receipts to the Department of Agriculture. The court also found that the plaintiffs have not been paid for their wheat, either in cash or in kind, although demand therefor had been made. Neither of these findings is challenged.

On the facts as outlined above, judgment was entered in plaintiffs' favor for the sum of $1,687.89, with interest, and this appeal followed.

The defendant assumes the posture that it is not liable on its bond for acts committed by Lyman after Lyman's license was suspended. We think this position untenable for reasons hereafter given.

Before probing into the merits of this lawsuit, it may not be amiss to mention a few time-tested rules which must guide us in determining the extent of the defendant's obligation under the bond. This court has long adhered to the rule that a compensated or corporate surety is not entitled to receive the benefit of *strictissimi juris* in the interpretation of its contracts (*Ortmeyer Lumber Co. v. Central Surety & Ins. Corp.*, 151 Kan. 226, 231, 98 P. 2d 97). The meaning of a contract of suretyship is to be ascertained in the same manner as the meaning of any other contract and within that meaning the surety is bound to the extent it has agreed to be bound (*Fuller v. Loftus*, 95 Kan. 223, 228, 147 Pac. 799). The primary rule in the construction of contracts is to ascertain the intention of the parties as gathered from the language employed, the subject matter of the agreement and the surrounding circumstances and conditions. (*Berg v. Scully*, 120 Kan. 637, 245 Pac. 119; *Francis v. Shawnee Mission Rural High School*, 161 Kan. 634, 170 P. 2d 807.)

As already noted, the bond executed by the defendant was given to secure two things: First, the performance of Lyman's obligations as a licensed warehouseman in relation to transactions entered into under the Act during the year commencing June 26, 1961; and second, such other obligations as Lyman might assume during the year under contracts with depositors of agricultural products in its licensed warehouse.

Turning to the first of the two conditions, we find that one of Lyman's obligations under the Act is plainly set out in section 250:

"Upon the filing with and approval by the Secretary of Agriculture, or his designated representative, of a bond, in compliance with this chapter,

for the conduct of a warehouse, *such warehouse may be designated as bonded hereunder; but no warehouse shall be designated as bonded under this chapter, and no name or description conveying the impression that it is so bonded, shall be used,* until a bond, such as provided for in section 247 of this title, has been filed with and approved by the Secretary of Agriculture, or his designated representative, *nor unless the license issued under this chapter for the conduct of such warehouse remains unsuspended and unrevoked."* (Emphasis supplied.)

This obligation was violated when Lyman, after its license had been suspended, accepted plaintiffs' grain and issued weight tickets certifying that it held "a license under the United States Warehouse Act," and that its elevator at Belpre was "a warehouse licensed under said Act and regulations." The representation by Lyman, while its license remained suspended, that it was licensed under the Act constituted a violation of the Act and a breach of the conditions contained in the bond. In stating, throughout its transactions with the plaintiffs, that its warehouse was licensed, when at the time its license was under suspension, Lyman was not performing its obligations under the Act but was, in fact, breaking one of the obligations imposed by the Act.

The second condition set forth in the bond required Lyman to perform such additional obligations of a warehouseman as it might assume, during the period of the bond, under contracts with persons depositing grain in its licensed warehouse. Here, too, we believe that Lyman defaulted in its performance. Having accepted plaintiffs' grain, Lyman was obligated to pay for it, either in kind or in money. This was an additional obligation undertaken by Lyman in its capacity of a warehouseman, and an obligation which we believe falls within the purview of the bond. The transactions were entered into during the period covered by the bond; Lyman was performing one of the functions of a warehouseman, that is, accepting wheat on open storage; and Lyman's obligation to compensate for the grain evidenced by the weight tickets was incurred to persons depositing grain in its warehouse.

But the defendant insists there has been no violation of the second condition set out in the bond because when the plaintiffs deposited their wheat, Lyman's warehouse was not licensed. The defendant points to the language of the bond reading, "such additional obligations as a warehouseman as may be assumed by it under contracts with the respective depositors . . . in such *licensed* warehouse(s)," (our italics) and argues that since Lyman's license

was suspended, its warehouse was no longer licensed; hence, that Lyman had assumed no obligation to a depositor in its *licensed* warehouse. A short answer to this ingenious argument might well be that the suspension of Lyman's license was not equivalent to its revocation.

However, we need not rest our rejection of the defendant's argument on that ground. Even though Lyman's warehouse may not have been licensed when plaintiffs' grain was accepted, we think there would still be liability. The bond which the defendant executed differs in one material respect from the statutory requirements. Section 247 requires that the bond secure performance "of such additional obligations as a warehouseman as may be assumed by it under contracts with the respective depositors of agricultural products in *such* warehouse," (our italics) not such *licensed* warehouse.

The addition of the qualifying adjective *licensed* before "warehouse" is without legal significance. The defendant cannot limit its liability or change the legal effect of the bond by such a deviation from the statute's requirement.

The general rule is that statutory terms will be read into a bond in determining liability, and that conditions not required by statute will be stricken from the bond as surplusage (12 Am. Jur. 2d, Bonds, § 26, p. 495). In *Ellsworth v. Hurt,* 158 Kan. 232, 146 P. 2d 365, we said:

"This court has held that when a statute requires a bond to be given and a bondsman undertakes to furnish it, the obligation of the bond which is imposed by the statute is read into the terms of the bond, and any of its text at variance with the statutory requisites is ignored. Such is the doctrine of the notable case of *Barber County Comm'rs v. Lake State Bank,* 122 Kan. 222, 226-227, 252 Pac. 475. Likewise, in *Duke v. National Surety Co.,* 130 Wash. 276, 227 Pac. 2, it was held that conditions in a statutory bond which are repugnant to the statute are to be treated as surplusage." (p. 233.)

In a later case, *Bartley v. Bartley,* 171 Kan. 465, 233 P. 2d 735, the Hurt case was cited with approval, and it was held:

"Where the statute requires a bond as a prerequisite to the performance of an act or duty prescribed or authorized by statute, the bond which is given in conformity with the statute must be interpreted in the light of the statute, and any of its text at variance with the statute will be ignored." (Syl. ¶ 2.)

There is nothing in the record, or in the bond itself, to suggest that the bond was to terminate as to "additional obligations" on suspension or revocation of Lyman's license. Had the defendant

intended the bond period thus to be limited, a provision to such effect could easily have been included in the bond. This was not done, nor does the record reflect that such a limitation was contemplated when the bond was executed. By its terms, the bond was for a period of one year commencing June 26, 1961, and no cancellation is shown prior to the expiration date.

The fact that the plaintiffs had placed their wheat in open storage, relying on weight tickets rather than warehouse receipts, would not operate to relieve the defendant of liability. We believe the case of *Hartford Accident and Indem. Co. v. State of Kansas*, 10 Cir. (1957), 247 F. 2d 315, while not strictly in point, bears sufficient analogy to the present action to justify comparison. In that case, a public warehouseman licensed under the laws of Kansas had accepted grain on "open storage" as well as on warehouse receipts. In a decision holding the bonding company liable to the owners of grain left on open storage, after default by the warehouseman, the court said:

". . . An interpretation of the various sections of the Kansas Grain Warehouseman Statute leads us to conclude that all grain delivered to a licensed warehouseman which is not sold to him becomes stored grain, and that this results whether a statutory warehouse receipt is issued or whether the deposit of the grain is evidenced by such scale tickets as are involved in this case. We agree . . . that under these scale tickets the depositors of wheat did not sell their wheat and had a right to receive it back upon demand; that this wheat was held in storage subject to the orders of the holders of the scale tickets; and that with respect thereto Olson was at all times acting in his capacity as a warehouseman." (p. 320.)

The defendant cites *Kipp v. Goffe & Carkener*, 144 Kan. 95, 58 P. 2d 102, 108 A. L. R. 918, and *Fidelity State Bank v. Central Surety & Ins. Corp.*, 10 Cir. (1955), 228 F. 2d 654. We think neither case is decisive of the questions presented here. In each case, the court held that notice of certain facts was to be imputed to the plaintiff. Under the circumstances of the instant action, it may not be inferred that plaintiffs had notice of Lyman's suspension at the time they dealt with Lyman; the trial court, indeed, found to the contrary.

We conclude that the trial court's judgment is correct, and the same is affirmed.