No. 82,095

Hartford Casualty Insurance Company, *Appellee*, v. Credit Union 1 of Kansas, *Appellant*.

(992 P.2d 800)

Opinion
filed November 5, 1999.

*Robert E. Keeshan,* of Peterson & Keeshan, of Topeka, argued the cause and was on the brief for appellant.

*Michael E. Francis,* of Sloan, Listrom, Eisenbarth, Sloan, & Glassman, L.L.C., of Topeka, argued the cause and was on the brief for appellee.

The opinion of the court was delivered by

DAVIS, J.: Credit Union 1 of Kansas (Credit Union 1) financed used car dealer Daniel E. Sanchez, d/b/a Midwest Motor Sport, with a floor loan secured by two of the vehicles purchased. Sanchez agreed to but did not remit the proceeds upon sale of the vehicles. Credit Union 1 made a claim upon Sanchez' vehicle dealer bond required by K.S.A. 1998 Supp. 8-2404 and issued by Hartford Casualty Insurance Company (Hartford). Hartford refused payment and filed a declaratory judgment action. The trial court granted Hartford judgment, holding that Kansas law limits the class of persons who may recover upon a vehicle dealer bond to consumers. We reverse and remand.

The case was presented to the trial court upon the following stipulated facts:

"1. At all times material, Credit Union 1 of Kansas has operated as a credit union organized and existing under the laws of the State of Kansas.

"2. Daniel E. Sanchez formerly operated Midwest Motor Sport, a proprietorship, in Topeka, Kansas.

"3. Midwest Motor Sport operated as a used car dealership.

"4. At all times material, Hartford Insurance Co. has operated as an insurance company organized and existing under the laws of the State of Connecticut and conducts business in the State of Kansas.

"5. Among the business conducted by Hartford Insurance Co. in Kansas is that of providing vehicle dealer bonds pursuant to K.S.A. 8-2401, *et seq.*

"6. At all times material hereto, Hartford Insurance Co. was the surety on bond #603-9581-73 . . . .

"7. That Daniel E. Sanchez signed a promise to pay Loan Liner per agreement dated December 15, 1986.

"8. In 1993, Credit Union 1 of Kansas made certain floor plan loans to Midwest Motor Sport and two of the loans were secured by a 1986 Pontiac Grand Am and a 1990 Nissan 4 X 2 standard pick-up truck.

"9. That Daniel E. Sanchez also had an Expandacheck Agreement and Real Estate Loan.

"10. That Credit Union 1 of Kansas sent to Daniel E. Sanchez Consumers Rights to Cure.

"11. As a part of the two loan transactions in question, it was agreed that Midwest Motor Sport would repay the loan to Credit Union 1 of Kansas from the proceeds of the sale of the vehicles [the Grand Am and the pickup].

"12. Sometime after entering into the loan agreement, the vehicles securing the debt were sold by Midwest Motor Sport yet the proceeds of the sales were retained rather than paid to Credit Union 1 of Kansas as required by the loan agreement.

"13. In 1996, Daniel E. Sanchez commenced a case under Chapter 13 of the United States Bankruptcy Code in the United States Bankruptcy Court for the District of Kansas and the case captioned *In re Daniel Emanuel Sanchez,* Case No. 96 42040 13.

"14. In due course, Credit Union 1 of Kansas filed its proof of claim alleging that its claim was secured by the 1986 Pontiac Grand Am and the 1990 Nissan 4 X 2 pickup truck, among other property.

"15. In the bankruptcy proceeding, Credit Union 1 of Kansas was successful in lifting the stay under the bankruptcy code and was allowed to proceed with its claims against Daniel E. Sanchez, formerly doing business as Midwest Motor Sport in its case filed in Shawnee County, Kansas.

"16. After Credit Union 1 of Kansas discovered that the vehicles had been sold but the proceeds were not paid to it pursuant to terms of the agreement, Credit Union 1 of Kansas commenced its action against Daniel E. Sanchez, formerly doing business as Midwest Motor Sport in the District Court of Shawnee County, Kansas, Case No. 96 CV 260, alleging, among other things, that Sanchez, doing business as Midwest Motor Sport had committed fraud by selling the vehicles and retaining the proceeds of the sales instead of paying the proceeds to plaintiff from said vehicles.

"17. On November 12, 1997, Credit Union 1 of Kansas obtained judgment in the District Court of Shawnee County, Kansas, in its refiled action titled *Credit Union 1 of Kansas v. Daniel Emanuel Sanchez,* Case No. 97 CV 1145, in the amount of $15,519.64 plus interest and of that amount, $6,290.00 plus contractual pre-judgment interest of 10.5% A.P.R. from the date of December 5, 1986 and March 1, 1993 and post-judgment interest is attributable to the failure of Daniel W. Sanchez, d/b/a Midwest Motor Sport to pay the proceeds of the sale of the two vehicles as required under the terms of the loan agreement.

"18. The purpose of the loans secured by the vehicles to Midwest Motor Sport by Credit Union 1 of Kansas was to floor plan finance the business of Midwest Motor Sport.

"19. That Daniel E. Sanchez is paying $5,000.00 plus the contractual rate of interest in the Bankruptcy plan to pay this Real Estate Mortgage and also had a set off of $54.83 on his share account leaving a debt of more than $6,290.00 unpaid in the Bankruptcy case of which Credit Union 1 of Kansas claims herein with interest from Hartford Casualty Insurance Co."

Credit Union 1 demanded payment under the bond. Hartford responded that it could not pay out without a letter from the Dealer Licensing Bureau requesting payment. Credit Union 1 obtained a letter from the Director of Vehicles which stated that the judgment resulted from an act which would constitute grounds for suspension, revocation, or refusal to renew the motor vehicle dealer's license, or for the imposition of an administrative fine pursuant to K.S.A. 8-2411. The letter directed payment of $5,450 to be made under the bond.

Hartford, upon receipt of the letter, refused to pay the bond and filed a declaratory judgment action alleging that no payment was required because Credit Union 1 was not a member of the class sought to be protected by the bond requirements of K.S.A. 8-2402.

The trial court agreed and concluded that the purpose of the Kansas Vehicle Dealers and Manufacturers Licensing Act (Act), K.S.A. 8-2401 *et seq.*, was to protect the public interest in the purchase and trade of vehicles. The trial court interpreted the Act as applying only to protect consumer purchasers of vehicles rather than lenders of vehicle dealers. The court found that because Credit Union 1 was not a purchaser, but rather a lender, Credit Union 1 was not within the class intended to be protected by the surety bond requirement of K.S.A. 1998 Supp. 8-2404(i). The court ruled that Credit Union 1 was not entitled to payment under the surety bond and granted judgment for Hartford.

Credit Union 1 appealed and the case was transferred to this court from the Kansas Court of Appeals under K.S.A. 20-3018(c).

Standard of Review

The resolution of this case on appeal involves the interpretation of a statute. The interpretation of a statute is a question of law, and this court's review is unlimited. *Hamilton v. State Farm Fire & Cas. Co.*, 263 Kan. 875, 879, 953 P.2d 1027 (1998). The fundamental rule to be applied when interpreting a statute is that the intent of the legislature governs, where that intent can be ascertained. *Legislative Coordinating Council v. Stanley*, 264 Kan. 690, 702, 957 P.2d 379 (1998). Where a statute is plain and unambiguous, the court must give effect to the intention of the legislature

as expressed, rather than determine what the law should be. *In re Marriage of Killman*, 264 Kan. 33, 42-43, 955 P.2d 1228 (1998). Where, however, the face of the statute leaves its construction uncertain, the court is not limited to a mere consideration of the language used, but may consider the historical background of the enactment, the circumstances attending its passage, the purpose to be accomplished, and the effect the statute may have under the various constructions suggested. See *Adams v. St. Francis Regional Med. Center*, 264 Kan. 144, 156, 955 P.2d 1169 (1998).

### Interpretation of K.S.A. 1998 Supp. 8-2404

K.S.A. 1998 Supp. 8-2404 is part of the Vehicle Dealers and Manufacturers Licensing Act, which concerns licensing requirements for the sale and manufacturer of vehicles in Kansas. Section (i) of K.S.A. 1998 Supp. 8-2404 sets forth the bonding requirements for vehicle dealers and in pertinent part provides:

"Every applicant or licensee who is or applies to be a used vehicle dealer or a new vehicle dealer shall furnish and maintain a bond in such form, amount and with such sureties as the director approves, in the amount of $15,000, conditioned upon the applicant or licensee complying with the provisions of the statutes applicable to the licensee and as indemnity for any loss sustained by any person by reason of any act by the licensee in violation of any act which constitutes grounds for suspension or revocation of the license. . . . Upon determination by the director that a judgment from a Kansas court of competent jurisdiction is a final judgment and that the judgment resulted from an act in violation of this act or would constitute grounds for suspension, revocation, refusal to renew a license or administrative fine pursuant to K.S.A. 8-2411, and amendments thereto, the proceeds of the bond on deposit or in lieu of bond provided by subsection (j) shall be paid."

Kansas case law concerning the Act is sparse. The sole case concerning the surety bond required by vehicle dealers is *Nicklin v. Harper*, 18 Kan. App. 2d 760, 860 P.2d 31 (1993). The plaintiff in *Nicklin* contracted with a used car dealer to sell her car. The dealer sold the car but did not remit the proceeds to the plaintiff. The Court of Appeals found that the dealer's action was a violation of then K.S.A. 1992 Supp. 8-2410, thus triggering the provisions of K.S.A. 1992 Supp. 8-2404(i). The Court of Appeals concluded that the plaintiff was allowed to proceed with garnishment to collect on

the bond. 18 Kan. App. 2d at 769-70. In so concluding, the Court of Appeals cited with approval *General Elec. Credit Corp. v. United Pac. Ins. Co.*, 80 Or. App. 129, 135, 722 P.2d 15, *rev. denied* 302 Or. 86 (1986), wherein the Oregon Court of Appeals stated that a statute requiring motor vehicle dealers to be bonded " 'is remedial for the protection of persons injured by a bonded party. It should be liberally construed to accomplish its purpose.' " 18 Kan. App. 2d at 769.

The express language of K.S.A. 1998 Supp. 8-2404(i) requires that in order for a person to collect on a vehicle dealer's bond, there must be (1) a loss, sustained by (2) any "person" under the statute, that is caused (3) "by reason of any act by the licensee in violation of any act which constitutes grounds for suspension or revocation of the license."

The Director of Vehicles found that the judgment of Credit Union 1 against Sanchez resulted from an act which would constitute grounds for suspension, revocation, or refusal to renew the motor vehicle dealers license or an administrative fine. K.S.A. 1998 Supp. 8-2410(a) lists 32 separate grounds upon which a license may be denied, suspended, or revoked or the renewal of a license refused. K.S.A. 8-2411 gives the Director of Vehicles the power to level an administrative fine for the listed violations.

In finding that the judgment resulted from an act which would constitute grounds for suspension, revocation, or refusal to renew the motor vehicle dealer's license or an administrative fine, the Director of Vehicles did not specify which section of K.S.A. 1998 Supp. 8-2410(a) had been violated by Sanchez. The district court, in its decision, noted that one of the grounds listed, K.S.A. 1998 Supp. 8-2410(a)(12), would apply. This section prohibits the dealer from "knowingly violating any law relating to the sale, distribution or financing of vehicles." We note that the provisions of K.S.A. 1998 Supp. 8-2410(a)(8) (knowingly making a fraudulent sale or transaction), also apply to the transaction we consider.

The undisputed facts established that the actions of Sanchez caused a loss to Credit Union 1. Rather than remitting the sale of proceeds to Credit Union 1, Sanchez chose to retain the proceeds,

thus depriving Credit Union 1 of its secured interest. Thereafter, Sanchez filed for bankruptcy.

The remaining question which would seem to resolve this case is whether Credit Union 1 is "any person" as defined by the Act. K.S.A. 1998 Supp. 8-2401(u) defines "person" under the Act to mean "any natural person, partnership, firm, corporation or association." From our reading of the pertinent provisions above, it becomes clear that the express provisions of K.S.A. 1998 Supp. 8-2404(i) would include Credit Union 1 as a "person" within the purview of the Act.

However, the district court ruled that despite the plain language of the statute, Credit Union 1 was not a person to whom the Act was intended to apply. Rather, the district court determined that the purpose of the Act was to protect only consumers who purchased vehicles from dealers and not entities which provided financing to dealers. This conclusion, however, contravenes one of the major rules of statutory interpretation, which is that where the statute is plain and unambiguous, the court must give effect to the intention of the legislature as expressed rather than determine what the law should be. See *In re Marriage of Killman*, 264 Kan. at 42-43.

K.S.A. 8-2402 provides a declaration of public policy for the Act, stating:

"It is hereby declared to be the public policy of this state to provide for fair and impartial regulation of those persons engaged in manufacturing, distributing or selling of vehicles. The provisions of this act which are applicable to such activities shall be administered in such a manner as will continue to promote fair dealing and honesty in the vehicle industry and among those engaged therein without unfair or unreasonable discrimination or undue preference or advantage. It is further declared to be the policy of this state to protect the public interest in the purchase and trade of vehicles, so as to insure protection against irresponsible vendors and dishonest or fraudulent sales practices and to assist, provide and secure a stable, efficient, enforceable and verifiable method for the distribution of vehicles to consumers in the state of Kansas and provide a system of tracking the flow of vehicles and their parts as well as preserving supporting services for consumers purchasing or otherwise acquiring vehicles."

The conclusion of the district court that this announced public policy clearly established that the Act applied only to consumers is

not supported by a close reading of the policy expressed. It is true that the primary focus of the Act appears to be the protection of the consumers who purchased vehicles from dealers. In addition, a majority of the grounds upon which dealers' licenses may be suspended or revoked concern sales to consumers. See K.S.A. 1998 Supp. 8-2410(a). Moreover, testimony before the legislature also indicates that the main focus of the surety bond requirement is to protect consumers. See Statement by the Kansas Motor Car Dealers Association, Hearing on S.B. 128 before the Senate Committee on Transportation and Utilities, February 14, 1989.

However, another important part of the public policy behind the entire Act is to "promote fair dealing and honesty in the vehicle industry and among those engaged therein without unfair or unreasonable discrimination or undue preference or advantage" and to "protect the public interest in the purchase and trade of vehicles." In furtherance of this policy, the Act provides not only for the regulation of dealers as sellers of vehicles but also regulates franchising agreements between dealers and manufacturers and distributors. K.S.A. 1998 Supp. 8-2410(a)(13) (identifying as grounds for revocation or suspension of license certain coercive or collusive tactics used by manufacturers and distributors against dealers); K.S.A. 1998 Supp. 8-2410(a)(15) (identifying as grounds for revocation or suspension of license the failure of a manufacturer or distributor to supply dealers under a franchise agreement).

We interpret the purpose of the Act to be the protection of the public interest in the supply of motor vehicles. While primary protection is given to consumers, this purpose does not exclude protection of lenders from fraudulent transactions made by dealers. It is in the public's best interest to insure that financing is available for dealers so that their operations may be conducted. Moreover, it is in the interest of the public that dealers not be allowed to fraudulently sell vehicles which are subject to a security interest where the title might thus be suspect. Contrary to the district court's conclusion, the public policy, as stated in the Act does not exclude Credit Union 1 from the protection of the Act under the facts of this case.

We note that our holding is consistent with the majority of states interpreting similar vehicle dealer statutes. See *Massachusetts Co. v. Cent. Corp.*, 124 Colo. 379, 383-84, 237 P.2d 1079 (1951); *Interstate Sec. Co. v. Hamrick's Auto Sales, Inc.*, 238 So. 2d 482, 483-84 (Fla. Dist. App. 1970); *Bryant Motors v. American States Ins.*, 118 Idaho 796, 798-99, 800 P.2d 683 (Ct. App. 1990); *Sun Ins. Co. v. Aetna Ins. Co.*, 169 Neb. 94, 109-112, 98 N.W.2d 692 (1959); *State v. General Insurance Company of America*, 179 N.W.2d 123, 125-27 (N.D. 1970); *Action Mortgage Corp. v. Van Deusen*, 291 S.C. 208, 211-12, 352 S.E.2d 711 (Ct. App. 1987); *Lawrence v. Ward*, 5 Utah 2d 257, 260-62, 300 P.2d 619 (1956). In the absence of clear legislative history directing otherwise, these courts have construed such statutes indemnifying "any person" to include not only consumers or purchasers but also lenders. But see *Ins. Co. of North America v. Gen. Elec.*, 119 Ariz. 97, 99-100, 579 P.2d 601 (Ct. App. 1978) (holding that, despite language stating that the bond ran in favor of "any person," lenders are not protected because "[a]s a matter of policy, we see no justification for adding the bond to the arsenal of remedies afforded a secured creditor by contract and by the Uniform Commercial Code").

K.S.A. 1998 Supp. 8-2404(i) uses broad language in specifying the persons entitled to collect on a vehicle dealer's surety bond. Nothing in the stated policy of the Act, nor in the legislative history, limits the application of that language to consumers. It is also clear that the legislature, had it wanted to limit the application of the surety bond statute, could easily have done so by clearly limiting those persons entitled to collect. In the absence of such a limit and in accordance with the general rule that surety statutes, being remedial, should be broadly construed, we conclude that a lender is in fact a protected party under K.S.A. 8-2404(i). Accordingly, we reverse the decision of the district court.

The Language of the Bond

Credit Union 1 also advances the argument that the terms of the surety bond itself renders Hartford liable. Indeed, the surety bond at issue states that it runs to the benefit of "the STATE OF KANSAS and severally to such persons who shall conduct business with

said principal in its capacity as a motor vehicle dealer." The bond further provides that it exists as "indemnity for any loss sustained by any person by reason of any act by the licensee constituting grounds for suspension or revocation of the license in accordance with and under authority of K.S.A. 8-2401 *et seq.*"

It is true that the language used in the bond stating that it runs to the benefit of such persons who conduct business with the dealer includes lenders such as Credit Union 1. However, the bond is a statutory bond, given in compliance with the requirements of K.S.A. 1998 Supp. 8-2404(i). We have held that where a statute requires a bond to be given, the bond which is given in conformity with the statute must be interpreted in light of the statute, and any provision at variance with the statute is to be disregarded. See *Bartley v. Bartley*, 171 Kan. 465, 470, 233 P.2d 735 (1951); *Nicklin v. Harper*, 18 Kan. App. 2d 760, 768, 860 P.2d 31 (1993). Statutory terms will be read into the bond in determining liability, and conditions not required by the statute will be stricken from the bond as surplusage. *Stevens v. Farmers Elevator Mutual Ins. Co.*, 197 Kan. 74, 78, 415 P.2d 236 (1966). Thus, the rights of Credit Union 1 as a protected party under the bond are governed by K.S.A. 1998 Supp. 8-2404(i).

Attorney Fees

The trial court did not reach the issue of attorney fees under the provisions of K.S.A. 1998 Supp. 8-2404(i), since it determined that Credit Union 1 was not a protected party under the bond. However, because we have reversed the trial court, we remand this case to the trial court on the issue of attorney fees.

K.S.A. 1998 Supp. 8-2404(i) provides that "[u]pon a finding by the court in such enforcement proceeding that a surety has wrongfully failed or refused to pay, the court shall award reasonable attorney fees to the judgment creditor." This court has not had an opportunity to interpret the question of under what circumstances attorney fees should be awarded under K.S.A. 1998 Supp. 8-2404(i). The portion of K.S.A. 1998 Supp. 8-2404(i) concerning attorney fees is a relatively recent addition to the statute, having been enacted in 1993. See L. 1993, Ch. 252, § 6. *Nicklin v. Harper*,

18 Kan. App. 2d 760, the only Kansas case dealing with an interpretation of the Act did not have an opportunity to address the recent addition regarding attorney fees.

The liability of Hartford for attorney fees under the provision of K.S.A. 1998 Supp. 8-2404(i) depends on this court's interpretation of the phrase "wrongfully failed or refused to pay" as used in the statute. Hartford would have us interpret this phrase to require bad faith similar to the provisions for attorney fees in insurance actions found in K.S.A. 40-256. This statute authorizes payment of attorney fees where the court finds that the insurer "has refused without just cause or excuse to pay the full amount of [the] loss." We have interpreted this language to mean that the denial of the claim was frivolous, unfounded and "patently without any reasonable foundation." *Clark Equip. Co. v. Hartford Accident & Indemnity Co.*, 227 Kan. 489, 494, 608 P.2d 903 (1980). Under the provisions of K.S.A. 40-256, attorney fees are not available where an insurer has substantial cause to believe that its interpretation of the statute is correct and denies coverage in good faith. See *Allied Mut. Ins. Co. v. Gordon*, 248 Kan. 715, 735, 811 P.2d 1112 (1991). Whether just cause exists is to be determined by the circumstances facing the insurer when payment is denied, judged as they would appear to a reasonably prudent person having a duty to investigate in good faith. *Watson v. Jones*, 227 Kan. 862, 871, 610 P.2d 619 (1980).

The alternative is to interpret the language "wrongfully failed or refused to pay" as similar to that used under Kansas law regarding the duty of an insurance company to defend an insured. Although not statutory language, an insurance company that *wrongfully refuses* to defend an insured is liable for the amount of judgment against the insured as well as expenses incurred by the insured in defending the suit and any additional damages traceable to the insured's refusal to defend. See *George R. Winchell, Inc. v. Norris*, 6 Kan. App. 2d 725, Syl. ¶ 1, 633 P.2d 1174, *rev. denied* 230 Kan. 817 (1981). This standard does not require a lack of good faith on the part of the insurance company. Rather, the insurer is liable for attorney fees if it is mistaken as to whether it owed a duty to defend. 44 Am. Jur. 2d, Insurance § 1416. See *Spruill Motors, Inc. v. Uni-*

*versal Underwriters Ins. Co.*, 212 Kan. 681, 688-89, 512 P.2d 403 (1973) (recognizing a difference between attorney fees for refusal to defend and attorney fees under K.S.A. 40-256).

Recently, this court reiterated this principle in *Farm Bur. Mut. Ins Co., v. Kurtenbach*, 265 Kan. 465, 481-83, 961 P.2d 53 (1998), wherein we held the insurance carrier liable for attorney fees for the breach of its duty to defend. While there was no duty to defend in the present case, the principle recognized is that the standard for a wrongful refusal to defend is just that—the refusal to defend when a defense should have been provided.

While there is no express legislative history regarding the amendment to 8-2401(i), it should be noted that prior to the amendment, a claimant could have recovered attorney fees against a surety under the provisions of K.S.A. 40-256. See *State, ex rel., v. Masterson*, 221 Kan. 540, 551, 561 P.2d 796 (1977). Thus, if the term as used in K.S.A. 8-2404(i) "wrongfully failed or refused to pay" was actually meant to incorporate the standards of K.S.A. 40-256, there was no reason for the amendment. " ' "There is a presumption that the legislature does not intend to enact useless or meaningless legislation." ' " *KPERS v. Reimer & Koger Assocs., Inc.*, 262 Kan. 635, 643, 941 P.2d 1321 (1997).

The legislature, when it enacted K.S.A. 1998 Supp. 8-2404(i), was aware of the interpretation of this court of the term "wrongfully refused" in the context of a duty to defend. Thus, it may be said that the legislature chose the statutory language with this interpretation in mind. See *International Ass'n of Firefighters v. City of Kansas City*, 264 Kan. 17, Syl. ¶ 2, 954 P.2d 1079 (1998) (in statutory construction, words and phrases that have acquired peculiar and appropriate meanings in law shall be construed according to those meanings).

We conclude that the language contained in the 1993 amendment of K.S.A. 8-2404(i) is different from the standards applied in regard to fees provided by K.S.A. 40-256. The rationale of the above cases regarding the duty to defend is more appropriately applied to the attorney fee provisions of K.S.A. 1998 Supp. 8-2404(i). Where the bond company refuses to pay, as it did in this case, and such refusal is found to be incorrect, it will be liable for

attorney fees under the provisions of K.S.A. 1998 Supp. 8-2404(i). Thus, Credit Union 1 is entitled to attorney fees for the district court action as well as those fees incurred before this court. We have reviewed the claim for fees made before this court and find the fees and printing costs requested are reasonable. We, therefore, grant appellate attorney fees against Hartford in the amount of $3,744, together with printing costs in the amount of $107.31. We remand this case to the district court for assessment of attorney fees for services performed before the district court.

Reversed and remanded with directions.