No. 49,241

CRESTVIEW BOWL, INC., *Appellee,* v. WOMER CONSTRUCTION CO., INC., *Appellant.*

(592 P.2d 74)

Opinion filed February 24, 1979.

*Jerry G. Elliott,* of Foulston, Siefkin, Powers & Eberhardt, of Wichita, argued the cause, and *John F. Eberhardt* and *Richard D. Ewy,* of the same firm, and *William P. Higgins,* of Wichita, were on the brief for the appellant.

*Everett C. Fettis,* of Wichita, argued the cause, and *David R. McClure,* also of Wichita, was with him on the brief for the appellee.

The opinion of the court was delivered by

McFARLAND, J.: This is an action for judicial determination of the rights and obligations of the parties under a written real estate lease. The declaratory judgment action was brought by the tenant, Crestview Bowl, Inc., who is plaintiff-appellee. The landlord-defendant, Womer Construction Co., Inc., counterclaimed for $24,971.52 allegedly due under the lease. The trial court entered findings and conclusions in favor of the tenant and the landlord appeals.

The first issue before this court is the proper standard of review. The matter was submitted to the trial court on the oral statements and stipulations of counsel and documentary evidence. No witnesses testified. The proper standard of review, as we stated in *Fourth Nat'l Bank & Trust Co. v. Mobil Oil Corp.*, 224 Kan. 347, Syl. ¶¶ 1 and 2, 582 P.2d 236 (1978), is as follows:

> "When a case is submitted to the trial court on an agreed stipulation of facts and documentary evidence, this court is afforded the same opportunity to consider the evidence as the trial court.
>
> "Where the controlling facts are based upon written or documentary evidence by way of pleadings, admissions, depositions and stipulations, the trial court has no peculiar opportunity to evaluate the credibility of witnesses. In such situation, this court on appellate review has as good an opportunity to examine and consider the evidence as did the court below, and to determine *de novo* what the facts establish. (Following *American States Ins. Co. v. Hartford Accident & Indemnity Co.*, 218 Kan. 563, 572, 545 P.2d 399 [1976].)"

Accord, *In re Estate of Broadie*, 208 Kan. 621, 624, 493 P.2d 289 (1972); *Koch, Administratrix v. Prudential Ins. Co.*, 202 Kan. 229, 447 P.2d 825 (1968); *North River Ins. Co. v. Aetna Finance Co.*, 186 Kan. 758, 352 P.2d 1060 (1960).

The entire record on which the trial court made its determination is before this court. After careful review of the record we adopt the findings of fact of the trial court, numbered 1-3, 5-17, and 19, with our additions and deletions where noted:

> "1. Plaintiff, Crestview Bowl, Inc., is a corporation conducting a bowling business in property owned by and leased from defendant.
>
> "2. Defendant, Womer Construction Co., Inc., is the owner of and lessor of the property in which plaintiff conducts its bowling business.
>
> "3. On May 3, 1961, a lease agreement, the subject matter of this action, was entered into between plaintiff and defendant. . . . Those portions of the lease agreement which give rise to this controversy read as follows:
>
> " 'Tenant in consideration of leasing the premises as above set forth, covenants and agrees with Landlord to pay to Landlord or its Assigns or successors as rent for the same, the sum of Three Hundred Eighty-four Thousand Dollars

($384,000.00) for said term of ten (10) years, payable in the following manner, to-wit: Said rent is to be paid monthly in advance, payable on the First day of each and every month, in the amount of Three Thousand Two Hundred Dollars ($3,200.00) each month. Tenant will also pay any increase in taxes starting with the year 1967 over and above the taxes for 1962.

" 'Landlord hereby grants to the Tenant, if the terms and conditions of this lease are fully and faithfully performed by said Tenant, to extend said lease for a period of ten years from the First day of June, 1971, to the 31st day of May, 1981, for a consideration as rent for same the sum of Four Hundred Twenty Thousand Dollars ($420,000.00), payable in advance at the rate of Three Thousand Five Hundred Dollars ($3,500.00) on the First day of each and every month.'

[Further, we find the lease contained an optional second extension as follows:

"Landlord hereby further grants to the Tenant, if the terms and conditions of this lease and first extension thereof are fully and faithfully performed by said Tenant, to extend said lease for a period of ten years from the First day of June, 1981, to the 31st day of May, 1991, for a consideration as rent for same the sum of Four Hundred Eighty Thousand Dollars ($480,000.00), payable in advance at the rate of Four Thousand Dollars ($4,000.00) on the First day of each and every month."]

. . . .

"5. Warren A. Thomas and W. A. Thomas, (hereinafter referred to as Thomas) are one and the same person.

"6. At the time of the execution of the lease in 1961 and until sometime in 1974 Thomas was president, general manager, a director and member of the executive committee of plaintiff corporation. Thomas was at all times owner of approximately 25 per cent of the stock of plaintiff corporation. During the time Thomas was general manager of plaintiff corporation he received approximately $100.00 per week compensation.

"7. At the time of the execution of the lease in 1961 Thomas was secretary-treasurer of defendant corporation and was owner of approximately 25 per cent of the stock of defendant. Since approximately September 19, 1974, Thomas has been, in addition to secretary-treasurer, vice president and general manager of defendant. During the years 1961 through 1974 Thomas had authority to make day-to-day operating decisions for defendant. Major decisions affecting defendant's operations were retained in R. W. Womer, principal stockholder. The division of authority of defendant was a matter between R. W. Womer and Thomas. At all times Thomas received compensation for services performed for defendant. Thomas, through an organization of R. W. Womer, sold plaintiff its insurance coverage.

"8. Plaintiff's executive committee was composed of Thomas, president; Warren Tomlinson, vice president; and Forrest Rousey, secretary-treasurer.

"9. Financial statements of plaintiff were prepared each year by plaintiff's secretary-treasurer. These financial statements were received by Thomas and other stockholders. None of the yearly financial statements ever reflected any liabilities due defendant from plaintiff at any time. At the time Thomas received these financial statements he was secretary-treasurer of defendant. Thomas at no time took exception to any financial statement of plaintiff because it failed to include any indebtedness due defendant.

"10. In 1972 plaintiff declared and paid a stockholder's dividend of approximately $10.00 per share. In 1973 plaintiff declared and paid a stock dividend of approximately $1,000.00 per share. In 1972 and 1973 defendant was aware, through its secretary-treasurer and day-to-day operating manager, Thomas, that plaintiff was financially able to make payment on debts due defendant, if any.

"11. At an executive committee meeting of plaintiff sometime during 1967 or 1968, Thomas raised the matter of additional payments due defendant because of the tax increase provision in the lease. Plaintiff at that time was having financial difficulties and was unable to make the additional tax payments. At this meeting Tomlinson suggested that he talk·with R. W. Womer and try and persuade him that defendant should waive the tax clause in the lease. Thomas urged Tomlinson not to talk to Womer. Thomas stated he would take the matter up with Womer. If Thomas ever discussed the waiver of the tax clause with Womer, Thomas never reported Womer's decision to Tomlinson and Rousey. If Womer declined to waive the tax clause in the lease, Thomas, as president and general manager of plaintiff, and as secretary treasurer of defendant, has chosen to ignore Womer's decision.

"12. On March 6, 1973, approximately five years after Thomas stated he would discuss with Womer the waiver of the tax clause, Thomas wrote Tomlinson and Rousey. The subject matter of this letter, in general, was the financial situation of plaintiff. In this letter Thomas states, 'Let's not talk about the "tax acceleration" clause in the lease.' Thomas gave no explanation for this statement and no further reference is made to this subject.

"13. In December, 1974, and through this present action, defendant seeks to recover as 'additional rent' a tax liability due since 1967 which its secretary-treasurer declined to discuss with himself and the other officers of plaintiff in March, 1973.

"14. In a letter from Rousey to Thomas, dated May 9, 1973, Rousey stated as follows:

" 'd. Sixth paragraph - "Let's not talk about the 'tax acceleration' clause in the lease." After the first five years of our lease had expired, you brought the tax acceleration provision up for discussion in one of our Committee Meetings. Warren Tomlinson and myself felt at that time that the Landlord had a good deal and that the acceleration clause should be waived. Warren offered to discuss the acceleration with Randle [Womer], but you said you would handle. I was very surprised that you would mention the waiving of such clause almost seven years later.'

"This letter was approximately one year prior to the death of R. W. Womer. This letter served as a reminder to the secretary-treasurer of defendant that plaintiff had never been advised of any amount due defendant, if any.

"15. . . . Defendant knew at all times the amounts being received from plaintiff and in what amount plaintiff was indebted, if any. Defendant received all tax statements on the property owned by it and leased to plaintiff. Defendant, not plaintiff, knew if there had been any increase in taxes starting with the year 1967. Defendant knew from 1967 until 1974 that plaintiff had never been advised of any increase in taxes and that none had been paid. Defendant knew, in June, 1971, when plaintiff exercised its option to extend the lease, that plaintiff had not paid additional taxes. From 1967 to 1974 defendant chose to remain silent as to the tax increase clause.

"16. In December, 1974, Thomas, as vice president and general manager of defendant, prepared and sent plaintiff a statement. This statement purports to advise plaintiff of 'Additional Rent Due To Tax Acceleration Clause.' This statement also advises plaintiff as follows: 'Rent to be increased starting with 1967 for tax increase over 1962.'

"17. Defendant's Counterclaim states that plaintiff is indebted to defendant for tax liabilities in the amount of $24,971.52, as shown by Exhibit 'A'.

. . . . .

"19. Plaintiff has never failed to pay the rent stipulated in the lease. Defendant has been continuously aware of the financial situation of plaintiff since the inception of the lease. Until December, 1974, defendant had never indicated to plaintiff that it was not fully and faithfully performing under the lease."

We further find that the lease was prepared by Warren A. Thomas, who was an officer and stockholder in both plaintiff and defendant corporations at the time of its drafting and execution. The lease was prepared equally and jointly by the parties. The trial court went on to conclude as follows:

"1. The lease agreement provides that plaintiff will pay any increase in taxes only for the second five (5) years of the first ten (10) year period of the lease.

"2. The lease does not provide that plaintiff will pay any increase in taxes for the second or third ten (10) year extension periods of the lease.

"3. The liability for taxes was for ad valorem taxes only.

"4. The lease does not provide for plaintiff to pay additional rent during any period, including the extension ten (10) year periods, because of tax acceleration clause or for any other reason.

"5. Plaintiff is not indebted to defendant for any tax liabilities.

"6. Plaintiff is not indebted to defendant for any additional rent.

"7. The defendant corporation, by the actions and failures to act on the part of its officers and stockholders, who were fully aware at all times of the corporation's rights, has waived any claim it had or has against plaintiff under the lease agreement.

"8. A consideration is not necessary in all cases to support a waiver, it being a mere voluntary relinquishment of a known right.

"9. Judgment is granted in favor of plaintiff and against defendant on defendant's counterclaim.

"10. The costs of this action are taxed to defendant."

The conclusions of law of the trial court are not adopted by this court.

We turn now to the next issue on appeal, which is whether the tax increase provision applies only to the base ten-year period. The first question to be determined in connection with this issue is whether or not the language in question is ambiguous. Ambiguity is defined in *Wood v. Hatcher*, 199 Kan. 238, 242, 428 P.2d 799 (1967), as follows:

"The language in a contract is ambiguous when the words used to express the meaning and intention of the parties are insufficient in a sense the contract may be understood to reach two or more possible meanings. . . . It arises when application of pertinent rules of interpretation to an instrument as a whole fails to make certain which one of two or more meanings is conveyed by the words employed by the parties."

We conclude there is ambiguity in the language of the lease as to whether the provision in the base term of the lease, relating to the payment of increased taxes from 1967, was intended to apply to any extension thereof.

In construing an ambiguous contract one established rule of construction is that it will be construed strictly against the party who drew or prepared it and liberally toward the other party. *Desbien v. Penokee Farmers Union Cooperative Association,* 220 Kan. 358, 363, 552 P.2d 917 (1976). Mr. Thomas, the individual preparing the contract, was an officer and stockholder of both parties. We have previously found that, under these circumstances, the contract was prepared jointly and equally by the parties, and we now conclude it cannot be liberally or strictly construed against either party. Oddly enough, Thomas was not called as a witness for either party, although he was present at the trial.

Another rule of construction is that we must look to the contract as a whole and interpret it so as to ascertain the intention of the parties and to give effect to that intention if it can be done consistently with legal principles. *Desbien,* 220 Kan. at 363.

In construing an ambiguous contract, a reasonable interpretation is sought. On this rule of construction, we held in *Tate v. Stanolind Oil and Gas Co.,* 172 Kan. 351, 356, 240 P.2d 465 (1952), as follows:

"Reasonable rather than unreasonable interpretations are favored by the law. (*Brooks v. Mull,* 147 Kan. 740, 747, 78 P.2d 879.) The meaning of a contract should never be determined by a critical analysis of a single or isolated provision but should always be ascertained by a consideration of all pertinent provisions. (*Heckard v. Park,* 164 Kan. 216, 219, 188 P.2d 926, 175 A.L.R. 605, 617.) Where ambiguity or uncertainty is involved the intention of the parties is not ascertained by resort to a literal interpretation of an isolated provision but by a consideration of the instrument as a whole, the object sought to be obtained and other circumstances, if any, which tend to clarify the real purpose and intent of the parties. (*Heckard v. Park,* supra.) A practical and equitable construction of ambiguous terms of a contract should be adopted. (*Berg v. Scully,* 120 Kan. 637, 245 Pac. 119;

*Francis v. Shawnee Mission Rural High School,* 161 Kan. 634, 640, 170 P.2d 807.)"

The ten-year base lease commenced in 1961 and required monthly rental payments of $3,200.00, plus any increase in taxes (using 1962 as the base) starting with the year 1967. The first extension was for ten years and required monthly rental payments of $3,500.00. The second ten-year extension called for rental payments of $4,000.00 per month. It is unreasonable to conclude that the payment of any tax increases terminated at the end of the base lease. The net effect of such a holding could result in the landlord receiving less actual compensation each year any extension of the lease is in effect. In our times of rapidly escalating real estate taxes it is unrealistic that the landlord would bind itself to absorbing all such tax increases from 1971 to 1991, while shifting the burden of the additional taxes to the tenant only for the years 1967 to 1971. We therefore conclude the provision in the base term, requiring the tenant to pay any tax increase over the 1962 taxes, was a part of each of the ten-year extension options.

The next issue before us is whether the landlord-defendant waived its claim with respect to the tax increase clause. The record is clear that at no time during the base term of the lease did the landlord request payment of the tax increases. Further, the landlord accepted the tenant's exercise of its option to extend the lease from 1971 to 1981, a condition precedent to the right of the option being that the "terms and conditions of this lease are fully and faithfully performed."

A waiver is a mere voluntary relinquishment of a known right. *Hurlbut v. Butte-Kan. Co.,* 120 Kan. 205, 206, 243 Pac. 324 (1926); 28 Am.Jur.2d, Estoppel and Waiver § 154, p. 836.

After the extension of the lease took effect, the landlord accepted the new monthly rental payments of $3,500.00 from June of 1971 to December of 1974 without any request for additional payments for the tax increases. We have no hesitancy in concluding that the landlord waived all right to tax increase payments through the year 1974. The tenant is liable for the tax increases over 1962, commencing with the year 1975.

The final issue on appeal is whether the term "taxes" in the tax increase clause related solely to ad valorem taxes and not to special assessments. In *State Highway Commission v. City of Topeka,* 193 Kan. 335, Syl. ¶ 1, 393 P.2d 1008 (1964), we said:

"While the word 'tax' in its broad meaning includes general taxes and special assessments, and in a general sense a tax is an assessment, and an assessment is a tax, this court has consistently held that under Article 11 of the Constitution of Kansas, taxes and assessments, technically considered, are different things. *Generally speaking, the difference between general taxes and a special assessment is* that the former are exactions placed upon the citizen by the taxing authorities for the support of the government, while a special assessment can be levied only on land, is based wholly on benefits conferred, and is exceptional both as to time and locality."

Generally, when a lease requires the tenant to pay the "taxes," this provision requires payment of ad valorem taxes only and not special assessments. *Railway Co. v. Railroad Co.*, 75 Kan. 167, 88 Pac. 1085 (1907). We therefore conclude that "taxes," as used in the lease, refers only to ad valorem taxes.

The judgment is affirmed in part, reversed in part, and remanded with directions to determine tax increase due for years 1975, 1976, 1977 and 1978, and enter judgment in accordance with this opinion. Costs are taxed one-half to each party.