**DORCHESTER EXPLORATION, INC. et al., Plaintiffs**

v.

**SUNFLOWER ELECTRIC COOPERATIVE, INC., Defendant.**

No. 77–1429.

United States District Court, D. Kansas.

Dec. 8, 1980.

William B. Browder, Jr., of Stubbeman, McRae, Sealy, Laughlin & Browder, Midland, Tex., and Richard Jones and Evan J. Olson, of Hershberger, Patterson, Jones & Roth, Wichita, Kan., for plaintiffs.

Joseph W. Kennedy and John P. Bowman, of Morris, Laing Evans, Brock & Kennedy, Chartered, Wichita, Kan., for defendant.

## DECISION OF THE COURT

KELLY, District Judge.

This is a case brought under the Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202, to resolve a dispute between plaintiffs Dorchester Exploration, Inc., et al., (hereinafter the Dorchester group), producers and sellers of natural gas, and defendants Sunflower Electric Cooperative, Inc. (hereinafter Sunflower), a buyer of such gas, over the meaning of an "FPC clause" in the parties' gas purchase contract. The Dorchester group contends that if the ceiling price for interstate natural gas sales established by the Federal Power Commission (FPC) comes to exceed the price otherwise established by the parties' contract, then the disputed clause provides that the contract price immediately escalates to the FPC ceiling price, but that only the former, lower price is immediately payable, with the balance of the increased price for any gas received becoming due on the next "price redetermination date", which occurs once every two years. Sunflower contends that the disputed clause provides that the contract price escalates to the FPC ceiling price only on the redetermination date, and remains at the original contract price in the meantime; in the alternative, if the Court finds that the disputed clause has the meaning advanced by the Dorchester group, Sunflower requests that the gas purchase contract be reformed on grounds of fraud or mutual mistake. Sunflower has also counterclaimed for the return of funds it paid to the Dorchester group in reliance on the latter's representation that the contract provided for an automatic price increase of one cent per million cubic feet (Mcf) of gas on June 1, 1976. Sunflower contends that under the contract such automatic price increase took effect only on February 1, 1977, and bases its counterclaim on theories of fraudulent misrepresentation and unjust enrichment; it further seeks punitive damages because of the Dorchester group's allegedly wanton, willful, and malicious misconduct.

When this action was filed by the Dorchester group on October 19, 1977, the FPC had established a national ceiling rate far in excess of the original contract price, but Sunflower's alleged obligation to pay additional sums had not yet matured, because such additional payments would have come due, if at all, only at the next price redetermination date, February 1, 1978. In the meantime, the price redetermination date has passed and thus defendant's obligation has allegedly matured; plaintiffs claim damages for defendant's alleged breach of contract in an amount in excess of $2,378,-000 plus interest. Defendant's counterclaim is for actual damages of $16,880.32 plus interest, and for punitive damages of $750,000. By agreement of the parties, trial on the issues of plaintiffs' damages has been deferred pending this Court's resolution of the remaining issues.

This case was tried to the Court on October 14 through October 17, 1980. Having heard the evidence, and having carefully reviewed the briefs and arguments of the

parties in the light of applicable law, the Court has determined that section 4.5 of the parties' contract bears the meaning advanced in this litigation by defendant Sunflower, who therefore bears no liability to plaintiffs; the Court has also determined that defendant Sunflower must prevail on its counterclaim, and is thus entitled to actual damges of $16,880.32, plus interest, but is not entitled to punitive damages. The Court makes its decision in conformance to the findings of fact and narrative conclusions of law set forth in the remainder of this opinion.

### Findings of Fact

1. Plaintiff Dorchester Exploration, Inc., is a Delaware corporation with principal place of business in Midland, Texas. The remaining plaintiffs are all residents of, or are incorporated in and have principal places of business in, states other than Kansas. Defendant Sunflower Electric Cooperative, Inc. is a Kansas corporation with principal place of business in Hays, Kansas.

2. Sunflower is a nonprofit cooperative in the business of generating electric power; it sells that power at wholesale to eight member cooperatives that distribute it to commercial and residential customers throughout the western portions of the state of Kansas. Early in 1973 Sunflower undertook to search for a supply of natural gas to fuel a newly-completed electric generating plant located in Garden City, Kansas. In mid-1973 representatives of Sunflower were contacted by Cecil Rhodes and Robert Duke, members of the Dorchester group who owned gas-producing properties in Hamilton and Greeley counties, Kansas. This early contact led to further discussions between Sunflower and the Dorchester group concerning a possible sale of gas and/or of potential gas-producing properties by the group to Sunflower, as well as a possible loan from Sunflower to the Dorchester group that would supply the latter with working capital necessary to the commercial development of its properties; these preliminary negotiations continued throughout late 1973. At an uncertain but relatively early point, the parties realized that agreement concerning Sunflower's purchase of the Dorchester group's potential gas-producing properties (the "reserve purchase") would be impossible; further discussions therefore concentrated on the gas sale and loan "package." Both sides recognized that consummation of the deal between them was contingent on Sunflower's obtaining a loan from the Rural Electrification Administration (REA) to finance the project.

3. In December 1973, William Aikman, president of Dorchester, sent Sunflower the initial draft of a proposed gas purchase contract. This proposed contract was drafted by James Pardue, attorney and legal adviser to the Dorchester group, who used an earlier contract between other parties as a model. That initial draft contained an "FPC clause"—numbered Section 4.3—that provided as follows:

> If the Federal Power Commission (FPC), or any other governmental agency having similar jurisdiction, shall at any time or from time to time during the term hereof prescribe or establish a ceiling area rate for gas producers applicable to jurisdictional interstate sales of natural gas within the State of Kansas that is greater than the price as otherwise provided in this capital agreement, then the price hereunder shall be increased to equal said ceiling rate effective on the same date as the effective date set forth in such order of the Federal Power Commission or other agency, subject to any subsequent revision, modification or amendment of said order.

4. The initial draft of the gas purchase contract was discussed by the parties at a Midland, Texas meeting that took place on January 11, 1974, but discussion of section 4.3 was limited. Sunflower neither acquiesced in nor objected to the section; the parties' negotiations, rather, focussed on other points. Both sides recognized, however, that if section 4.3 became a part of a final contract between them its intended effect would be that an FPC order which increased the appropriate ceiling rate for

interstate gas sales to a level above the contract price would immediately trigger a corresponding escalation in the contract price.

5. Section 4.3 appeared, unchanged, in a second draft of the proposed contract that was prepared by Mr. Pardue. When this second draft was discussed by the parties in a Hays, Kansas, meeting of February 18, 1974, section 4.3 was not mentioned; once again, the negotiations focussed on other points. Shortly after the Hays meeting, Mr. Pardue prepared a third draft of the proposed contract and delivered it to Sunflower. This third draft contained an FPC clause that was worded identically to the previous versions but that was renumbered as section 4.5; in all subsequent drafts of the proposed contract the FPC clause appeared as section 4.5.

6. In early March 1974, Sunflower requested that the REA lend it fifteen million dollars to finance its proposed transaction with the Dorchester group; copies of the proposed gas purchase contract and advance loan agreement were submitted to REA to explain and support Sunflower's loan request.

7. On March 11 and 12, 1974, various representatives of Sunflower met with REA officials in Washington, D.C. to discuss the loan request and the underlying transactions, including the gas purchase contract, that the loan was to finance: the Sunflower contingent at these meetings included Arthur Schnose, Sunflower's General Manager; Lewis Mitchell, President of Sunflower's Board of Trustees; Boyce Hardman, Sunflower's attorney; and Curt Guernsey, a utilities consultant retained by Sunflower. The REA administrator, David Hamill, indicated that he was favorably disposed toward making Sunflower the requested loan; he also indicated, however, that he and his staff regarded a number of provisions in the proposed Dorchester-Sunflower contract as less than favorable to Sunflower, and asked Sunflower to seek changes in these provisions to ensure that the contracts would merit final REA approval when executed. Paramount among such changes—in the REA's view—was the revision of the gas purchase contract so that any FPC-triggered increase in the price paid for gas would occur only on the biannual price redetermination dates provided for in section 4.2 of the proposed contract. Following the meetings with the REA officials the four Sunflower representatives discussed the various REA-suggested changes and agreed that at the next meeting with the Dorchester group they would insist that the FPC clause be rewritten so as to conform to the REA suggestion.

8. Shortly after the REA meetings, and in anticipation of a forthcoming negotiating meeting with the Dorchester group, Mr. Hardman prepared a 21-point agenda detailing the REA-requested changes in the proposed contracts. Mr. Hardman distributed copies of this agenda to the Dorchester group representatives at the start of the parties' next meeting, which took place in Dallas, Texas on March 21, 1974. Item 16 of the agenda read as follows: "Change 4.5 on page 15 by striking the word 'be' at the end of line 7 and adding the words 'at the next date for redetermination as provided for in 4.2 above, be.'"

9. At the March 21 Dallas meeting, Dorchester group representatives included Hughes Seewald, an independent oil and gas operator and one of the plaintiffs in this case, and Messrs. Aikman, Rhodes, Duke, and Pardue. Sunflower representatives present included Messrs. Schnose, Hardman, and Guernsey. Mr. Hardman acted as chief spokesman for Sunflower, while Mr. Pardue acted as chief spokesman for the Dorchester group. The meeting was structured around the 21-item agenda, each item being discussed in turn. Any item over which there was substantial controversy was "held" for further discussion after the remaining items had been covered.

10. When Mr. Hardman presented item 16 to the meeting he explained clearly that section 4.5, the FPC clause, needed to be revised so that any FPC-induced increases in the contract price would come into effect only at the next biannual price redetermination date. Item 16 generated no contro-

versy, and was not "held" for further discussion. After a recess in the meeting, during which the Dorchester group representatives held private discussions among themselves, Mr. Pardue announced, without comment or elaboration, that the Dorchester group agreed to item 16; the parties then turned to those agenda items that remained in controversy. The Dorchester group's present interpretation of the FPC clause was raised neither at the March 21 meeting nor at any time prior to the contract's execution.

11. Messrs. Aikman, Rhodes, and Pardue all testified that they were unable to recollect that Mr. Hardman had given any explanation of item 16 that revealed Sunflower's intentions regarding the requested changes in section 4.5. The Court, however, gives full credence to the testimony of Messrs. Schnose, Guernsey, and Hardman that a full and clear explanation was given by Mr. Hardman. Messrs. Aikman, Rhodes, and Pardue also testified that in the private discussions among the Dorchester group representatives it was unanimously concluded that after the changes in section 4.5 were made the section would have the meaning now advanced by the Dorchester group, and that no other interpretation so much as entered anyone's mind. The Court deems this testimony to be utterly unworthy of credence.

12. All the parties at the Dallas meeting intended that section 4.5 should be revised as set out in item 16 of the agenda, and further intended that the revised version of section 4.5 would mean that any price increase due to an FPC area rate order would take place only on the next price redetermination date. No possible alternative meaning occurred to any party until at least July 27, 1976, over two years after the contract's execution; in particular, the interpretation of section 4.5 advanced at trial by the Dorchester group was not within the contemplation of any parties when the contract was executed.

13. Shortly after the Dallas meeting, Mr. Pardue prepared and delivered to Sunflower a fourth draft of the proposed contract. Section 4.5 of that draft incorporated the change set out in item 16, as well as certain very minor changes apparently intended by Mr. Pardue to enhance the section's clarity, and read as follows:

If the Federal Power Commission (FPC) or any other governmental agency having similar jurisdiction, shall at any time or from time to time during the term hereof prescribe or establish a ceiling area rate for gas producers applicable to jurisdictional interstate sales of natural gas within the State of Kansas which is greater than the price as otherwise provided in this Agreement, then the price hereunder shall, at the next date for price redetermination provided for in Section 4.2 above, be increased to equal said ceiling rate effective on the same date as the effective date set forth in such order of the Federal Power Commission or other agency, subject to any subsequent revision, modification or amendment of said order.

14. Although Sunflower raised numerous objections to the fourth draft of the proposed contract, claiming that Mr. Pardue's draftmanship failed properly to set out certain agreements that the parties had reached in their Dallas meeting, and although Mr. Pardue was obliged to again redraft several portions of the contract, Sunflower found no fault with section 4.5 as set out immediately above, and that version of the FPC clause appears, unchanged, in the contract as subsequently executed.

15. The final draft of the gas purchase contract was completed by Mr. Pardue on about April 19, 1974, and was executed by the parties shortly thereafter. By its terms, the contract was expressly subject to approval by the REA, and thus became effective upon final REA approval on May 30, 1974.

16. Witnesses for the Dorchester group testified that when the contract was executed there existed many gas purchase contracts between other parties which would qualify for use in a section 4.2 price redetermination, and that these many contracts themselves contained FPC clauses of an un-

specified form. None of these many contracts, however, was offered into evidence.

17. Section 1.1(b) of the contract explicitly defines the term "contract year" as "a period of twelve (12) consecutive months during the term of this Agreement beginning on the first day of the month following the date of first delivery of gas hereunder, and on any anniversary of such day hereafter."

18. The first delivery of gas under the contract occurred during January, 1976.

19. Section 4.1 of the contract provides in part that "[t]he base price to be paid by Buyer [i. e., Sunflower] for gas . . . shall be 55 cents per Mcf for the first contract year" and that "[f]or each contract year thereafter . . . the base price shall escalate one cent per Mcf . . . ."

20. Section 4.2 of the contract provides in part that "Seller [i. e. the Dorchester group] is given the option to cause the price to be paid by Buyer for Seller's gas to be redetermined for the third and fourth contract years, and additional such options for each succeeding two contract years during the term of this agreement" and that "[s]uch redetermined price shall become effective as of the first day of the contract year for which it is determined." The section further provides in part that "[t]he redetermined price shall be computed by taking the average of the three (3) highest prices per MCF for gas being paid by pipeline company or companies to any producer" under a contract that meets certain elaborate specifications involving the contract's length of term, the quantity and quality of gas deliverable, the geographical location of the place of delivery, etc.

21. At the time the gas purchase contract was executed, as well as during the preceding period of negotiations, the applicable FPC ceiling area rate for interstate sales of natural gas in Kansas was approximately one-half of the 55 cent contract base rate provided for in section 4.2, and the parties had no particular expectation that the FPC rate would ever come to exceed the contract price, or reach any specific level. The Dorchester group's desire that the contract price be tied in some way to the FPC rate, as in both the original and revised versions of section 4.5, reflected its intention to take advantage of a remote and highly uncertain contingency. In distinct contrast, however, the parties—in particular the Dorchester group—believed that the price of gas sold intrastate, and thus not subject to FPC controls, was almost certain generally to increase, and that other gas producers in the area would eventually be very likely to receive more than 55 cents per Mcf for gas sold intrastate. The price redetermination provisions of section 4.2 reflected the Dorchester group's intention to take advantage of an extremely likely contingency, and it is thus not surprising that the parties' negotiations focussed much more closely on section 4.2 than on section 4.5.

22. Section 5.1 of the contract is the only section that makes any explicit mention of the time and manner of payment for gas received. That section reads as follows:

On or before the twenty-fifth (25th) day of each calendar month after the month of first delivery hereunder, Buyer agrees to account and make payment to Seller for all gas received by Buyer hereunder during the preceding calendar month. Such accounting and payment shall be supported by a statement showing the total amount of gas delivered to Buyer during such prior month or billing period and the amounts due therefor as provided in this Agreement. Such statement shall show such other information as is appropriate for a full understanding of the accounting and payment.

23. In mid-June 1976, Sunflower, per Mr. Schnose, received letters from Mr. Rhodes and Mr. Aikman requesting a one cent increase in the base price for gas as provided for in section 4.1 of the contract. Mr. Rhodes' letter declares that "[p]aragraph 3.2 states that our 'contract year' commences no later than June 1, 1975," and Mr. Aikman's letter declares that "[p]aragraph 3.2 of article III states that our contract year commences June 1, 1975."

24. Section 3.2 nowhere "states" when the "contract year" commences—indeed the words "contract year" do not appear in the section. Neither section 3.2 nor any other portion of the contract give any indication whatsoever of modifying the explicit and straightforward definition of "contract year" set out in section 1.1(b). Section 3.2—the "take or pay" clause—did oblige Sunflower to commence payment for gas on June 1, 1975 even if it had not taken delivery, and was clearly designed to hasten construction of the gas transmission facilities necessary to delivery of the gas. Messrs. Rhodes and Aikman testified at trial that they regarded the "take or pay" date as synonymous with the date of first delivery: the Court concludes that the greed of these men led them, at best, to an incredible flight of wishful thinking or, at worst, to bald-faced, cold-blooded utterly cynical lies, and it is not without misgivings that the Court finds the evidence adduced at trial insufficient to establish the latter.

25. In reliance on the representations of the Dorchester group, and without so much as a glance at the contract, Mr. Schnose arranged for payment to the Dorchester group of the additional one cent per Mcf as of June 1, 1976. From June 1, 1976 to February 1, 1977 payments attributable to that one-cent increase totalled $16,880.32; and exact breakdown of the time of payment, their amounts, and the identity of the payees is given in defendant's exhibit 52.

26. On July 27, 1976, the Federal Power Commission issued its Opinion No. 770. This FPC order established new uniform national rates for interstate sales of natural gas; its effective date was July 27, 1976. On November 5, 1976, the FPC issued its Opinion No. 770–A. This FPC order essentially affirmed Opinion No. 770, but clarified and partially modified it; the effective date of Opinion No. 770–A was also July 27, 1976. For gas from wells commenced on or after January 1, 1975, Opinion No. 770 established a national rate of $1.01 per Mcf, subject to certain adjustments, with a quarterly escalation of one cent per Mcf; this rate was reaffirmed in Opinion No. 770–A. For gas from wells commenced during 1973–74, Opinion No. 770 established a rate of $1.01 per Mcf, subject to certain adjustments; this rate was modified in Opinion No. 770–A to $0.93 per Mcf, with an annual escalation of one cent per Mcf. The opinions did not modify the earlier-established rates for gas from wells commenced prior to 1973.

27. Since FPC Opinion No. 770 came to plaintiffs' attention in about August, 1976, they have interpreted section 4.5's phrase "a ceiling area rate for gas producers applicable to jurisdictional interstate sales of natural gas within the State of Kansas" as encompassing the national rates set out in Opinion No. 770 and its successors. Yet following the issuance of these opinions, and at least until February 1, 1978, plaintiffs continued to carry the price of gas delivered to Sunflower on their books without accruing any FPC price increase, either as accounts receivable or otherwise; nor did plaintiffs reestimate their recoverable reserves to reflect the higher FPC price that would obviously increase the economic limit of their properties.

28. On August 28, 1975, the Federal Power Commission issued its Opinion No. 742. This FPC order provided that certain "small producers" were entitled to a higher ceiling rate of 130% the otherwise applicable ceiling rate. In Opinion No. 742–C, issued by the FPC on September 9, 1976, the FPC attempted to make clear that small producers were entitled to a ceiling rate of 130% the rates established in Opinion No. 770. Certain members of the Dorchester group claim to qualify as "small producers," and assert that under section 4.5 they are entitled to retroactive payment of the higher small producer ceiling rate.

29. The contract that Mr. Pardue used as a model in drafting the present contract contains an FPC clause which explicitly provides that "small producer" rates are not to be deemed applicable. In drafting the present contract Mr. Pardue did not include such an exclusion, presumably so that certain members of the Dorchester group might take advantage of any higher small producer rates.

30. Plaintiff Dorchester Exploration, Inc. keeps its books on an accrual basis, as opposed to a cash basis; the accounting system used by the remaining plaintiffs was not revealed at trial. If Dorchester had believed that the FPC Opinions 770 and 770–A entitled it to an immediate price increase for the gas it delivered to Sunflower, but that the increased portion would not be due and payable until a specific later date, generally accepted accounting principles would have dictated that when the increased price took effect the portion thereof not yet payable should have been accrued on Dorchester's books as an account receivable.

31. In March 1977 the Dorchester group gave formal notice to Sunflower that it was requesting a redetermination of price as provided for in section 4.2 of the contract. Since section 4.2 provides that such notice be given no more than ninety days prior to the beginning of the next contract year, it is obvious that the Dorchester group was operating under the assumption that the third contract year would commence on June 1, 1977, just as its earlier demand for the one-cent price increase was predicated on a belief that the second contract year commenced on June 1, 1976. Sunflower, per Mr. Schnose, arranged for a meeting between the parties—scheduled for April 13, 1977—so that the price redetermination could be discussed. It was not until just before the scheduled meeting that Mr. Hardman, in examining the contract for the first time in over two years, realized that the next contract year did not commence until February 1, 1978, and that the payment of the one-cent increase from June 1, 1976 to February 1, 1977, of which he had previously been unaware, had not been required by the contract.

32. The scheduled meeting between the parties took place in Dallas, Texas on April 13, 1977. At the meeting, Sunflower pointed out that the Dorchester group's belief that the next contract year commenced on June 1, 1977 was in error and that any price redetermination was therefore premature, since the next contract year actually was to begin on February 1, 1978. Sunflower simi-larly pointed out that the Dorchester group's equally erroneous representations in its demands for the one-cent increase had led Sunflower to pay that increase from June 1, 1976 to February 1, 1977, even though the contract did not provide for such payments: Sunflower therefore demanded that the overpayments which it had mistakenly made be returned.

33. It was at the April 13 meeting that the Dorchester group first communicated to Sunflower its present interpretation of section 4.5, under which, at the commencement of the next contract year it would be entitled to the retroactive payment of a nearly threefold increase in the price of gas, summing to several million dollars. In the absence of any credible evidence that such an interpretation was within the contemplation of the Dorchester group at the time the contract was executed, the Court infers that such interpretation was first developed in late 1976 or thereafter, and probably just before the April 13 meeting.

34. The Dorchester group has consistently refused the demands of Sunflower, first made at the April 13 meeting but renewed several times thereafter, that the mistaken payments of the one-cent increase be returned. The Dorchester group has refused these demands even though, since at least April 13, 1977, they knew that Sunflower was entitled to the funds it demanded.

### Conclusions of Law

At the outset, the Court concludes that under 28 U.S.C. § 1332(a) it has jurisdiction over the subject matter of this action. The Court also adopts the stipulations of the parties that venue is properly laid in this district and that all necessary persons are properly before the Court.

■ The Court concludes that the critical language of section 4.5 of the parties' gas purchase contract is ambiguous, in that such language may be understood to reach two or more possible meanings. *Crestview Bowl, Inc. v. Womer Construction Co.*, 225 Kan. 335, 339–40, 592 P.2d 74 (1979); *Wood*

*v. Hatcher*, 199 Kan. 238, 242, 428 P.2d 799 (1967). These different possible meanings surface because the language and punctuation employed in section 4.5 do not compel any definite conclusion as to which words of the section (if any) are intended to be modified by the phrase "effective on the same date as the effective date set forth in such order of the Federal Power Commission or other agency."

The Dorchester group urges the Court to conclude that above-quoted phrase modifies the phrase "the price hereunder shall . . . be increased," which is also modified by the phrase "at the next date for price redetermination provided for in section 4.2 above." At first glance, this version seems inherently self-contradictory in meaning, in that it appears to indicate that a price increase shall occur "at" one date but shall become "effective on" an earlier date; one is led to wonder why on earth both dates are mentioned. Plaintiffs attempt to resolve this seeming contradiction by asserting that the price increase becomes "effective," but not payable, on the earlier (but later-mentioned) FPC order date, and then becomes retroactively payable on the later (but earlier-mentioned) price redetermination date. The Court supposes that this is a not implausible reading of the disputed language—although it is certainly difficult to discern why the word "at" should carry an implication of payment not shared by the words "effective on"—but notes that words which most plausibly would have been employed had the parties' intention matched plaintiffs proffered interpretation—words such as "payment shall be deferred until" or "payment shall, retroactively, become due on"—are conspicuous by their absence.

Defendant Sunflower agrees that the phrase "at the next date for price redetermination provided for in section 4.2 above" modifies the phrase "the price hereunder shall . . . be increased," but suggests that the phrase "effective on the same date as the effective date set forth in such order of the Federal Power Commission or other agency" modifies the immediately preceding words "ceiling rate." Defendant points out that this interpretation dovetails nicely

with the FPC's practice, illustrated by Opinions No. 770 and 770–A, of establishing, in a single order that sets forth a single "effective date," ceiling rates that increase over time in small quarterly or annual steps subsequent to the "effective date": under defendant's interpretation, section 4.5's price increase does not include these small, periodic increments. The plausibility of Sunflower's interpretation is heightened by the fact that no comma or other clause-demarcating punctuation mark appears between the words "ceiling rate" and the words "effective on"; moreover, Sunflower's approach obviates the necessity of implying the presence of additional language so as to resolve an apparent contradiction between two distinct phrases that both modify a third phrase. The Court does not believe, however, that simply because defendant's exegesis of section 4.5 appears more plausible than plaintiffs' that the contract should be deemed unambiguously to bear that more plausible meaning.

Of course, it is possible that apparent ambiguity in one section of a contract can be resolved, without recourse to extrinsic evidence of intent, by reference to other unambiguous sections of that contract. This oft-fulfilled possibility is the source of the principles that a contract shall be construed in its entirety, rather than by critical analysis of a single or isolated provision, and that all the provisions of a contract should be taken into consideration and construed in harmony with one another. See *Weiner v. Wilshire Oil Co. of Texas*, 192 Kan. 490, 496, 389 P.2d 803 (1964). Both Sunflower and the Dorchester group have argued that these principles compel a decision in their favor.

The Dorchester group argues that Sunflower's interpretation of section 4.5 cannot be adopted because it would then never be possible for section 4.5 to cause a price increase not already guaranteed by section 4.2, and that section 4.5 would thus be a completely superfluous nullity. Plaintiffs reason that since section 4.2 provides for a biannual price redetermination to the average of the three highest prices paid under

comparable contracts within the area, and that since many of these contracts themselves contain FPC clauses whereunder the price paid is never less than the applicable ceiling rate, it will always be possible to find three contracts to plug into section 4.2's redetermination formula that will lead to a price that at least equals the FPC ceiling rate; thus, contend plaintiffs, the only way that section 4.5 can have any real effect is if it is interpreted to provide for a price increase that would sometimes take effect before the next biannual redetermination date. Superficially, this argument seems quite compelling; on closer examination, however, it can be seen to be fallacious.

To begin with, the Court has not been shown that the ceiling rates applicable under the "many" contracts with FPC clauses are necessarily the same as those applicable under the Dorchester-Sunflower contract. For example, the established ceiling rate has for some time varied with the age of the wells from which the gas is produced; thus some or all of the "many" contracts may be limited to the lower ceiling rate applicable to gas from older wells. Similarly, the established ceiling rate has for some time varied with the size of the producers; some or all of the "many" contracts may be limited to the lower ceiling rates applicable to large producers, either because the sellers under these contracts are large producers, or because the contracts specifically preclude application of any higher small producer rate (as did, for example, the contract that Mr. Pardue used as a model).

The Dorchester group's argument would be no more valid even if it were shown—as it was not—that ever since the parties' negotiations began there have been contracts in existence between other parties which on their face would ensure that any redetermination of price under section 4.2 would lead to a price equal to or greater than any ceiling rate established by the FPC or its successors. The parties here would have no way of knowing for certain that these other contracts would not be renegotiated to eliminate the operation of their FPC clauses, or that the operation of these clauses

might be prevented by the actions of courts or of various regulatory bodies that might not reach the instant contract. The Court notes, for example, that the United States District Court for the District of Wyoming has recently refused, on grounds of unconscionability, to allow several natural gas sellers to collect the higher prices that FPC clauses in their contracts provide for. See *Kerr-McGee Corp. v. Northern Utilities, Inc.*, 500 F.Supp. 625 (D.Wyo. 1980).

In short, contrary to the arguments of the Dorchester group, it is indeed *possible* that section 4.5, as interpreted by Sunflower, could provide for a price higher than that obtainable under section 4.2. To be sure, such an occurrence now appears unlikely, but scarcely more unlikely than it must have appeared in 1974 that the FPC, in little more than two years, would increase the applicable ceiling rate more than fivefold. To push the Dorchester group's rationale to its extreme, one would have to say that section 4.5 *began* as a nullity, was briefly incarnate, and has now returned to the netherworld for a stay of unknown duration; the Court is unaware of anyone competent to prophesy the date of the section's second coming.

Sunflower raises its own argument that construction of the contract as a whole compels the conclusion that section 4.5 bears the meaning that it has championed. Sunflower notes that section 5.1, the only portion of the contract that explicitly provides for the time and manner of payment for gas received, states only that Sunflower shall make monthly payments to the Dorchester group for all gas received during the previous month: arguing from the hoary maxim that *expressio unius exclusio alterius est,* Sunflower contends that section 5.1 indicates that the parties did not intend that any other payment—such as the retroactive payment of an increased price that could involve gas delivered over a two-year period—be made. While the Court does not regard this argument as unpersuasive, neither does it regard it as dispositive. It bears noting that section 5.1 does not expressly conflict with the Dorchester group's

interpretation of section 4.5, and if one is willing to believe that the parties' intent matched the Dorchester group's interpretation of section 4.5, and yet observes that the language of that section "expresses" such an intent in what can only be described as a grossly inartful manner, then one might as well assume that a consonant provision of Article V of the contract was inadvertently omitted.

Both Sunflower and the Dorchester group invoke the principle that in cases of ambiguous contractual language, such language shall be construed more strictly against its author, see, e. g., *Smith v. Russ*, 184 Kan. 773, 779, 339 P.2d 286 (1959); not surprisingly, each side seeks to drape the mantle of authorship around the other's shoulders. While this principle no doubt has its place in the situations where it is most typically employed—such as adhesion contracts prepared by insurance companies, lenders, etc., see 4 Williston on Contracts, § 621—the Court does not believe that it makes sense here to view *either* side as the author of the contract, or of section 4.5. The contract went through at least five drafts, and the contractual language was the subject of intense and protracted negotiations. It is no more significant that every draft was physically prepared by Mr. Pardue than that much of the contractual language was changed at the specific suggestion of Mr. Hardman; both sides had every opportunity to see to it that the contract clearly expressed their agreement, and must share responsibility for the fact that it does not.

■ It now appears that resort to the potentially-applicable principles or rules of interpretation has failed to resolve the ambiguity inherent in section 4.5; the Court has not lost sight, however, of the most fundamental such principle of all: a contract shall be interpreted so as to give effect to the mutual intentions of the parties thereto at the time the contract was made. *Garvey Center, Inc. v. Food Specialties, Inc.*, 214 Kan. 224, 229, 519 P.2d 646 (1974); 1 A. Corbin, Contracts, § 106. Since the Court has found that when the contract was

executed the parties shared the intention that section 4.5 should provide for a potential FPC-triggered price increase that would take effect only at a subsequent price redetermination date, it follows that section 4.5 should be interpreted to match that mutual intent. The Court feels obliged to explain why it finds that such an intent was mutual despite the arguments of the Dorchester group and the testimony of its witnesses that no such mutual intent existed.

The evidence at trial established beyond any reasonable doubt what Sunflower's intent was in requesting the changes in section 4.5, and the Court has accepted the testimony of the Sunflower witnesses that Mr. Hardman fully and clearly explained that intent at the March 21 meeting; it is undisputed that the Dorchester group agreed to the requested changes without raising any objections, or requesting any clarification. In the Court's view there are only two plausible conclusions that can be drawn from these underlying facts: either the Dorchester group shared Sunflower's intent, or else it realized that when the requested changes were made the resulting language would not clearly express that intent, and yet kept its counsel in hopes that the resulting ambiguity might at some point be exploitable to the Dorchester group's advantage. In the Court's view, the occurrences subsequent to the March 21 meeting are more consonant with the former conclusion than with the latter, although the Court also believes that even were the latter conclusion to be accepted a decision in Sunflower's favor would be appropriate. *See* Restatement of Contracts § 233(b); Restatement (Second) of Contracts § 227(2) (Tentative Draft No. 2). Accordingly, the Court concludes that defendant has not breached the parties' contract, that plaintiffs are not entitled to the relief they seek, and that section 4.5 of the parties' gas purchase contract shall be interpreted as if it read as follows:

If the Federal Power Commission (FPC), or any other governmental agency having similar jurisdiction, shall at any time or

from time to time during the term hereof prescribe or establish a ceiling area rate for gas producers applicable to jurisdictional interstate sales of natural gas within the State of Kansas that is greater than the price otherwise provided for in this Agreement, then the price hereunder shall, at the next date for price redetermination provided for in section 4.2 above, be increased to equal said ceiling rate that was established as of the effective date of the order of the Federal Power Commission or other agency, subject to any subsequent revision, modification or amendment of said order.

In view of this conclusion, the Court deems it unnecessary to consider Sunflower's request that the contract be reformed.

With regard to Sunflower's counterclaim for the return of the payment of a one-cent price increase from June 1, 1976 to February 1, 1977, the Court concludes that the parties' contract unambiguously provides that the one-cent price increase took effect only upon the first anniversary of the first day of the month following the first delivery of gas, and thus concludes that payment of the one-cent increase was not owing until after February 1, 1977. While the Court has been unable to discover any Kansas case on point, it has long been established in other jurisdictions that a person who pays an excessive amount of money to another under the erroneous belief that the parties' contract requires such payment is entitled to restitution of the excess payment, see Restatement of Restitution § 20, and Reporters' Notes thereto; the Court has no reason to believe that Kansas courts would not follow this ancient principle of equity. The Court therefore concludes that Sunflower is entitled to be repaid that portion of its payments for gas delivered from June 1, 1976 to February 1, 1977 which reflect the erroneously-accepted one-cent price increase. The Court further concludes that Sunflower is entitled to interest on its overpayments, as provided for in K.S.A. § 16–201, as amended, to be calculated from the dates the overpayments were "due" under section 5.1, as set forth in defendant's exhibit 52.

The Court cannot conclude, however, that the Dorchester group's demands for payment of the one-cent increase, coupled with Sunflower's acquiescence in that demand, are sufficient to constitute actionable fraud that might entitle Sunflower to punitive damages, because two of the five necessary elements set out in Miles v. Love, 1 Kan.App.2d 630, 631–32, 573 P.2d 622 (1977), were not established: it was not shown that plaintiff's misrepresentations were made knowingly or in reckless disregard of the truth, nor that Sunflower's reliance upon these representations was justified. Had Sunflower bothered to consult the contract, it might well have disabused itself of the notion that the price increase had taken effect.

Taken by itself, the Dorchester group's subsequent refusal to return the overpayments upon Sunflower's demand might seem to merit punitive damages, in that the refusal represented a deliberate failure to return money to which the Dorchester group knew it was not entitled. Taken in context, however, the Dorchester group's actions appear much less blameworthy. The refusal to pay these few thousand dollars was made after the parties were engaged in a dispute that now runs to several million dollars, and since the Court has not found that Dorchester's position in the greater dispute was taken in bad faith, it is likely that plaintiffs felt that there was little point to paying the small sum if there was good reason to believe they were themselves entitled to the larger one. In an ideal world, of course, the Dorchester group would have paid its smaller debt, but the Court believes that the refusal to do so is entirely understandable, albeit not strictly proper, and concludes that an award of punitive damages is not warranted. Cf. Nordstrom v. Miller, 227 Kan. 59, 70, 605 P.2d 545 (1980); Garcia v. Southwestern Bell Tel. Co., 216 Kan. 591, 592, 533 P.2d 1242 (1975).

Counsel for defendant is directed to forthwith calculate the amount of the interest award, and to prepare an entry of judg-

938

ment consistent with this opinion, which is to be filed with the clerk after approval by counsel for plaintiffs. Costs are to be taxed against plaintiffs.

IT IS SO ORDERED.