(125 P.3d 1078)

No. 94,195

WILBUR A. SCHWATKEN, TRUSTEE OF THE WILBUR A. SCHWATKEN REVOCABLE TRUST, and VEVA D. SCHWATKEN, TRUSTEE OF THE VEVA D. SCHWATKEN REVOCABLE TRUST, *Appellants/Cross-appellees*, v. EXPLORER RESOURCES, INC., DEVON SPS OPERATION, INC., DEVON ENERGY PRODUCTION COMPANY, L.P., and QUEST CHEROKEE, L.L.C., *Appellees/Cross-appellants*.

Opinion filed January 13, 2006.

*W.J. Fitzpatrick*, of Independence, for appellants/cross-appellees.

*David E. Bengtson*, of Stinson Morrison Hecker, LLP, of Wichita, and *John R. Horst*, of John R. Horst, P.A., of Caney, for appellee/cross-appellant Quest Cherokee, LLC.

Before MCANANY, P.J., GREEN and MARQUARDT, JJ.

MCANANY, J.: This case calls upon us to construe the terms and provisions of an oil and gas lease. The district court found in favor of the lessee. Upon review, we concur with and affirm the summary judgment entered by the district court.

On July 18, 2001, Wilbur and Veva Schwatken leased 2,366 acres of land to Explorer Resources, Inc., for oil and gas exploration and production. The lease was for an initial term of 3 years. Explorer assigned the lease to Quest Cherokee, L.L.C. There was no drilling or production on the leasehold until 10 days before the expiration of the initial 3-year lease term when Quest began drilling a gas well. The well was not completed until 10 days after the expiration of the initial 3-year term. However, it did produce gas in paying quantities once completed. Quest continued its drilling operations by starting a second well on October 4, 2004.

On November 23, 2004, the Schwatkens filed suit to cancel the lease. Quest continued its operations on the leasehold by continuing to drill the second well, which it completed in January 2005, and by starting a third well on December 30, 2004.

In January and February 2005, the parties presented the district court with opposing motions for summary judgment. Quest also moved the court for authority to suspend its ongoing drilling operations pending resolution of the dispute over whether the lease ended on July 18, 2004. The court denied Quest's motion to suspend drilling operations but sustained its summary judgment motion, finding that the lease extended beyond the initial 3-year term. The Schwatkens now appeal the district court's entry of summary judgment, and Quest cross-appeals the denial of its motion to suspend drilling operations.

The Schwatkens' appeal ultimately turns on two provisions in the lease. Since the issue of the duration of the lease was submitted to the district court on stipulated facts, and since its resolution

requires the interpretation of a written instrument, we review the issue de novo. See *Kneller v. Federal Land Bank of Wichita*, 247 Kan. 399, 400, 799 P.2d 485 (1990).

Paragraph 1 of the lease, which was drafted by Explorer, states:

"It is agreed that this lease shall remain in force for a primary term of 3 (Three) years from this date and as long thereafter as oil or gas of whatsoever nature or kind is produced from said leased premises or on acreage pooled therewith, or drilling operations are continued as hereinafter provided. If, at the expiration of the primary term of this lease, oil or gas is not being produced on the leased premises or on acreage pooled therewith but Lessee is then engaged in drilling, reworking or dewatering operations thereon, then this lease shall continue in force so long as dewatering or drilling operations are being continuously prosecuted on the leased premises or on acreage pooled therewith; and drilling operations shall consider to be continuously prosecuted if not more than ninety (90) days shall elapse between the completion or abandonment of one well and the beginning of operations for the drilling of a subsequent well. If after discovery of oil or gas on said land or on acreage pooled therewith, dewatering operations and the production of oil or gas should cease from any cause after the primary term, this lease shall not terminate if Lessee commences additional drilling, reworking or dewatering operations within ninety (90) days from the date of cessation of the dewatering operation or production or from date of completion of a dry hole. If oil or gas shall be discovered and produced as a result of such operations at or after the expiration of the primary term of this lease, this lease shall continue in force so long as dewatering operations continue or oil or gas is produced from the leased premises or on acreage pooled therewith."

Paragraph 18 of the lease, which was drafted by the Schwatkens, states: "It agreed that at the end of the primary term, this lease shall expire as to all lands located outside of a producing unit."

*Strict Construction*

The Schwatkens argue that the district court failed to construe the lease strictly against the lessee-producer and in favor of the lessor-royalty owner as they claim it was required to do. While it is true that ambiguities in oil and gas leases ordinarily are construed in favor of the lessor, *Sternberger v. Marathon Oil Co.*, 257 Kan. 315, 322, 894 P.2d 788 (1995), this is based on the fact that the lessee is most often responsible for drafting the document. Here, paragraph 18 was incorporated into the lease at the insistence of the Schwatkens. Its absence would have been a deal-breaker for them. The district court found that the Schwatkens drafted para-

graph 18. The remaining provisions were drafted by Explorer. We cannot consider the lease as being drafted jointly and equally by the parties as our Supreme Court found in *Crestview Bowl, Inc. v. Womer Constr. Co.*, 225 Kan. 335, Syl. ¶ 4, 592 P.2d 74 (1979), a case in which the draftsman was an officer and shareholder of each party. Nevertheless, doubtful language in a contract is construed most strongly against the party who drafted the provision over which doubt arises. *Wood River Pipeline Co. v. Willbros Energy Services Co.*, 241 Kan. 580, 586, 738 P.2d 866 (1987); *First National Bank of Lawrence v. Methodist Home for the Aged,* 181 Kan. 100, 104, 309 P.2d 389 (1957). Thus, paragraph 18 should be construed strictly against the Schwatkens, as its author, and the rest of the lease should be construed strictly against Quest, the successor in interest to its author.

Paragraph 1 of the lease provides that the lease will continue in force after the expiration of the primary term as long as drilling or dewatering operations are continuously prosecuted on the premises or on acreage pooled therewith. There is continuous prosecution if no more than 90 days elapses between the completion of one well and the beginning of drilling for the next well. Paragraph 18 states that the lease will expire at the end of the primary term as to all lands outside a producing unit. The district court found the lease to be ambiguous because of these contradictory provisions.

Quest complied with paragraph 1 of the lease. It began drilling a gas well before expiration of the initial 3-year term and continued its drilling activities without a lapse of more than 90 days between completing the first well and beginning drilling of the next one. But what is the effect of paragraph 18 under these circumstances?

*Producing Unit*

The Schwatkens argue the entire lease expired because Quest did not have any producing units by the end of the primary term. They argue "producing unit" means the portion of land immediately surrounding a producing well. Because there were no producing wells at the expiration of the primary lease, there were no producing units. Thus, the lease expired in its entirety. On the

other hand, Quest argues paragraph 18 does not apply because "producing unit" refers to the industry practice of pooling or unitizing oil and gas leases. It argues the provision in paragraph 18 is only applicable after a unit is formed pursuant to paragraph 12 of the lease and no such unit was formed here.

The problem with the Schwatkens' argument, as the district court noted, is that nowhere else in the lease other than in paragraph 12 is a portion of the leasehold referred to as a "unit." The land description attached to the lease refers only to acres and tracts and does not refer to any portion of land as a unit. Throughout the lease, land is discussed as "land," "acreage," "premises," or "tract." Paragraph 12, which relates to unitization, gives the lessee the right to pool or unitize the leasehold estate with other land or leases in the area when to do so would be an advantage in dewatering operations or in production. "Units" in this context refers to units created by this pooling activity of the lessee. Nowhere else in the lease is the term "unit" used in a manner consistent with the Schwatkens' construction of paragraph 18.

Defining unit consistent with the Schwatkens' argument would be incongruent in relation to the rest of the lease and general terminology used in the industry. See *Akandas, Inc. v. Klippel*, 250 Kan. 458, 465, 827 P.2d 37 (1992). Further, the phrases "lands located outside of a producing unit" and "producing unit" have no clear definitions in the lease. Under these circumstances, the test is what a reasonable person in the position of the lessee would have understood paragraph 18 to mean, not what the lessor who drafted paragraph 18 meant to say. See *First National Bank of Lawrence*, 181 Kan. at 104. In applying this test, we take note of the fact discussed earlier that the Schwatkens drafted the language of paragraph 18.

### The Habendum Clause

Whether paragraph 18 applies only to pooled acreage or to land upon which there is a productive well, it contradicts and attempts to override paragraph 1 of the lease which allows the lease to continue after the expiration of its initial 3-year term if the lessee is

engaged in drilling activities "on the leased premises or on acreage pooled therewith."

Paragraph 1 in the lease is a habendum clause, which is defined as:

"The provision in an oil-and-gas lease defining how long the interest granted to the lessee will extend. Modern oil-and-gas leases typically provide for a primary term—a fixed number of years during which the lessee has no obligation to develop the premises—and a secondary term (for 'so long thereafter as oil and gas produced') once development takes place." Black's Law Dictionary 730 (8th ed. 1999).

When there is an irreconcilable conflict between the habendum clause and another clause in the lease, the habendum clause ordinarily controls. See *Tate v. Stanolind Oil & Gas Co.*, 172 Kan. 351, Syl. ¶ 2, 240 P.2d 465 (1952). Here, paragraphs 1 and 18 cannot be harmonized. Given the facts that paragraph 18 lacks clarity in defining the producing unit it describes, that paragraph 18 was drafted by the Schwatkens, and that the construction advanced by the Schwatkens would result in a forfeiture of Quest's entire leasehold interest, the Schwatkens do not demonstrate a viable reason why this general rule should not apply. Since Quest demonstrated that it complied with paragraph 1 by commencing drilling during the initial 3-year term and continuing with drilling and production activities in a timely fashion thereafter, the district court did not err in sustaining Quest's summary judgment motion.

Quest points out in its brief that if the district court's summary judgment is affirmed, the issue raised by the cross-appeal becomes moot. Accordingly, we do not address the cross-appeal.

Affirmed.